J-S11045-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., JR. A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W.-B, BIOLOGICAL MOTHER | : | |
| | : | No. 1682 WDA 2019 |

Appeal from the Order Dated October 21, 2019
in the Court of Common Pleas of McKean County
Orphans' Court at No(s):  No. 42-18-0077

| | | |
|---|---|---|
| IN THE INTEREST OF: B.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W.-B., BIOLOGICAL MOTHER | : | |
| | : | No. 1683 WDA 2019 |

Appeal from the Order Entered October 18, 2019
in the Court of Common Pleas of McKean County
Orphans' Court at No(s):  42-18-0076

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.W.-B., BIOLOGICAL MOTHER | : | |
| | : | No. 1689 WDA 2019 |

Appeal from the Order Dated October 21, 2019
in the Court of Common Pleas of McKean County
Orphans' Court at No(s):  42-18-0078

BEFORE:  NICHOLS, J., MURRAY, J., and MUSMANNO, J.

J-S11045-20

MEMORANDUM BY MUSMANNO, J.:                    **FILED JULY 06, 2020**

A.W.B. ("Mother") appeals from the Orders,[1] granting the Petitions filed by the McKean County Children and Youth Services ("CYS"), seeking to involuntarily terminate her parental rights to her three minor, male children, J.B., Jr., born in August 2007; J.B., born in June 2008; and B.W., born in October 2011 (collectively, "the Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2, 3]  We affirm.

_____

[1] The above-stated Orders were dated October 16, 2019.  However, the docket reflects that the Notice, pursuant to Pa.R.C.P. 236(b), for B.W., was entered on October 18, 2019.  The Pa.R.C.P. 236(b) Notices for J.B., Jr., and J.B. were entered on October 21, 2019.  The respective Notice dates are considered to be the "entry" dates for the Orders.  ***See Frazier v. City of Philadelphia***, 735 A.2d 113, 115 (Pa. 1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given"); ***see also*** Pa.R.A.P. 108(a) (recognizing that the entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b).").

[2] In the three separate termination Orders, the trial court involuntarily terminated the parental rights of Mother and J.B., Sr. ("Father"), (collectively, "Parents"), to each of the Children.  Father has not filed any appeals challenging the termination of his parental rights, nor has he filed a brief in this appeal.

[3] In addition to the Children, Mother has three older children, N.W., a male born in June 1999; K.W., a female born in March 2001; and K.W., a male born in March 2006.  N.T., 5/31/19, at 27.  N.W. lives in Mother's home with his girlfriend and their son; and K.W. (female) and K.W. (male) live with C.D., who is Mother's mother ("Maternal Grandmother").  ***Id.***

- 2 -

In its Opinion,[4] the trial court ably and accurately set forth the factual background and procedural history of this appeal, which we adopt as though fully restated herein. Trial Court Opinion, 10/17/19, at 1-5. Importantly, the trial court stated the following:

> The [C]hildren were found to be dependent by an Order dated May 17, 2016. At that time[,] Mother had been sentenced to a [prison] term of 6 to 13 years.
>
> Father was incarcerated in the McKean County Jail[,] and was facing pending criminal charges and a [s]tate [p]arole revocation. Paternal grandparents, [W.B. ("Paternal Grandfather")] and [C.B. ("Paternal Grandmother")] [collectively, ("Paternal Grandparents")], indicated that they could provide kinship care for the [C]hildren. Therefore, [the Children] were placed in their home. [Paternal Grandparents] were also providing care for three additional grandchildren who were found to be dependent. Mother had requested visits with the [C]hildren (at her SCI facility). Visits with Mother have continued since the inception of the dependency action. Mother has maintained regular phone contact with the [C]hildren….
>
> The placement with [Paternal Grandparents] was found, in the initial dependency proceedings, to be going well. However, at the October 18, 2016, hearing[,] the court found that there were

_____

[4] There are three virtually identical trial court Opinions in this matter, one for each of the Children, with the only differences being the name of the subject child throughout the Opinion, and the remaining children referenced as that child's siblings. In this Memorandum, we will reference "Trial Court Opinion, 10/17/19," in relation to all three of the identical Opinions, unless otherwise indicated.

The trial court Opinion regarding J.B., Jr., erroneously states that J.B. was born in January 2008. However, the Opinions regarding J.B. and B.W. recite June 2008 for J.B.'s date of birth. **Compare** Trial Court Opinion (J.B., Jr.), 10/17/19, at 1, with Trial Court Opinions (J.B. and B.W.), 10/17/19, at 1. Moreover, Mother testified that J.B. was born in June 2008. **See** N.T., 5/31/19, at 26-27.

serious concerns. Service providers working with the family raised concerns to CYS regarding the treatment of the [C]hildren in the [Paternal Grandparents'] home. [Paternal Grandparents] had difficulty providing care for all [six] of the children. [The Children] have behavioral issues that [Paternal Grandparents] struggled with. The trial court found that [Paternal Grandparents] couldn't provide appropriate care for all [six] of the children. Therefore, the Children were placed in the [Foster Parents'] foster home [in September or October of 2016. N.T., 1/22/19, at 82.].

[Foster Parents] have provided exceptional care for [the Children]. They have worked with service providers and school staffs to assure that their needs are met. They will adopt the [C]hildren[,] if that is an option. [N.T., 1/22/19, at 124.]

At the October 18, 2016, hearing[,] [M]aternal [G]randmother [ ] indicated that she was a placement option for [the Children]. However, [Maternal Grandmother] had three other grandchildren in her home[,] and there had been issues regarding previous visits there. Services were put in place to assist [Maternal Grandmother] with the development of skills[,] and a plan to have all [six] of the children placed in her care.

At the review hearing on January 18, 2017, the court found that the [C]hildren continued to do well in the [Foster Parents'] foster home. [Maternal Grandmother] was still requesting that the [C]hildren be placed with her. However, additional concerns had arisen about the lack of supervision in [Maternal Grandmother's] home during the [C]hildren's weekly visits with [Maternal Grandmother] and their siblings. [Maternal Grandmother] had a hard time controlling and supervising all of the [C]hildren.

At a review hearing on March 8, 2017, despite the previous emphasis and directives to [Maternal Grandmother] not to leave the [C]hildren unattended during the sibling visits, it was discovered that she continued to do so. A plan was put in place for an additional caregiver to assist [Maternal Grandmother] when the [C]hildren visited her, particularly when she was at work.

At the review hearing on September 22, 2017, the court found that there had been a significant and troubling incident during a visit with [Maternal Grandmother]. The [C]hildren were left alone[,] and B.W. found and took some medication that was

prescribed for [Maternal Grandmother]. He had to receive emergency medical treatment. It became evident that, although [Maternal Grandmother] deeply cares for [the Children,] and they enjoy their relationship with her, she would not be a future placement option for them. Since the [C]hildren had been in placement for some time[,] the permanency plan for the [C]hildren was discussed, including the potential of termination and adoption by [Foster Parents]….

Trial Court Opinion, 10/17/19, at 2-4.

Subsequently, while released from incarceration, Father violated his parole conditions and committed new criminal offenses, for which he was re-incarcerated.[5] *Id.* at 5. The trial court stated that both Mother and Father are incarcerated in State Correctional Institution ("SCI") facilities,[6] and both Parents have a history of prior criminal convictions and have had serious drug and alcohol addiction issues. *Id.* at 1.

On April 4, 2019, CYS filed a separate Petition for each of the Children, seeking to involuntarily terminate Parents' parental rights. At the time of the termination hearings underlying this appeal, the Children had resided in the

_____

[5] The trial court explained that, during the dependency proceedings, Father was paroled in December 2017, but absconded from a drug treatment facility, and a warrant was issued for his arrest. Trial Court Opinion, 10/17/19, at 5. After apprehension, in June 2019, Father was sentenced, including for additional convictions for offenses committed while he was released on parole, to four to eight years in prison. *Id.* The trial court emphasized that Father had not followed through on the promises and representations that he made to the court at the permanency hearing on September 22, 2017. *Id.* at 6.

[6] Mother is incarcerated at SCI-Cambridge Springs. N.T., 5/31/19, at 22.

foster home of pre-adoptive Foster Parents, T.L., and her boyfriend of fifteen years, D.T., since September 2016, for between 2½ and 3 years.[7] Trial Court Opinion, 10/17/19, at 1; N.T., 1/22/19, at 14, 82, 124.

Parents were represented by independent legal counsel in the termination proceedings. On April 13, 2019, the trial court appointed Mark Hollenbeck, Esquire ("Attorney Hollenbeck"), as the Children's legal interests counsel and guardian *ad litem* ("GAL"). Subsequently, on January 15, 2019, the trial court appointed Kord Kinney, Esquire ("Attorney Kinney"), to represent the Children's legal interests, as the Children's legal interests counsel, with Attorney Hollenbeck to remain as GAL.[8]

On January 22, 2019, May 31, 2019, and October 4, 2019, the trial court held evidentiary hearings on the termination Petitions, at which both Father and Mother were present, along with their respective counsel.[9] **See** N.T.,

_____

[7] **See** N.T., 1/22/19, at 112-13, 132.
[8] **See In re Adoption of L.B.M.**, 161 A.3d 172 (Pa. 2017) (plurality). Attorney Kinney indicated that he had met with each of the Children on the day prior to the hearing. N.T., 1/22/19, at 7, 19. B.W., who was seven years old, and J.B., Jr., who was eleven years old, wished to testify at the hearing. **Id.** J.B., who was ten years old, did not wish to testify. **Id.** Based on the Children's ages, and, after questioning J.B., Jr., and B.W. *in camera*, the trial court found that the Children understood the termination proceedings. **Id.** at 27-28.

[9] At multiple places in her appellate brief, Mother references testimony from an additional day of testimony, July 31, 2019. We note that the trial court docket, the trial court Opinion, and the briefs of the other parties do not make reference to July 31, 2019, as a day of evidentiary hearing in the termination proceedings.

1/22/19, at 8, 27. At the January 22, 2019, termination hearing on the termination Petitions held on January 22, 2019, the trial court separately questioned B.W. and J.B., Jr., *in camera*. *Id.* at 9-26.[10] CYS presented Brianna Jones ("Ms. Jones"), the intake supervisor for CYS assigned to the family. *Id.* at 74. CYS then presented the testimony of Donna Trimm, who was previously employed by CYS and the ongoing caseworker for the family. *Id.* at 79. Next, CYS presented the testimony of Foster Mother. *Id.* at 112. Finally, CYS presented the testimony of Amanda Johnson, who is the ongoing supervisor at CYS and has been involved with the family since mid-October 2016. *Id.* at 134-35.

Immediately prior to the testimony of Ms. Jones, Attorney Kinney stated that, because he had been appointed on January 15, 2019, he had not had time to file a motion for an expert bonding assessment, so he was orally presenting the Motion. N.T., 1/22/19, at 70. Mother's prior counsel, Erika Mills, Esquire ("Attorney Mills"), joined in the Motion.[11] *Id.* at 71-72. CYS did not dispute the existence of a bond between the Children and Mother, but did

_____

[10] CYS presented the testimony of Shawn Hartman ("Hartman"), who is employed by the Pennsylvania Board of Probation and Parole as a parole agent, and has been twice assigned to supervise Father when he was released on parole. *Id.* at 56. As Father is not challenging the termination of his parental rights, Hartman's testimony is not relevant to this appeal.

[11] In an Order entered on March 8, 2019, the trial court granted Attorney Mills permission to withdraw as counsel, and appointed Mother's current counsel, Anthony V. Clarke, Esquire ("Attorney Clarke").

not concur with the Motion, stating that the trial court could decide the nature of the bond without an expert assessment. *Id.* at 73. The trial court decided to hear the remainder of the testimony and rule on the Motion later in the hearing, reasoning that there was no requirement for expert testimony regarding the bond between the parent and a child. *Id.* at 70-74.

At the close of testimony, the trial court stated that there was a sufficient question as to the effect on each of the Children from severing their bond with Mother to warrant the appointment of a bonding expert. *Id.* at 139. The trial court expressed concern about ordering an evaluation because the court did not need an assessment of whether a bond existed with both parents, the Foster Parents, and Maternal Grandmother, because of the parties' agreement that such a bond exists. *Id.* The court was concerned about the effect of severing that bond, which would involve the expert meeting with the Children individually and ascertaining the effect of the termination of Mother's parental rights on them. *Id.* at 139. The trial court added,

> I also don't want to limit the evaluator and say, "I know how you should do this" because I'm not the expert.
>
> But I am really worried about the typical, "[l]et's have visits with mom and interview" and this is "[d]id the kids smile, did they go up and did they respond[,]" and we don't need that. We already know that the [C]hildren are bonded with [M]other[;] the question is what will the effect be if that bond is severed [-] positive or negative, [or] both? ….

*Id.* The GAL agreed to an assessment, but requested that the time frame for the assessment would not be longer than necessary. *Id.* at 140. The trial

- 8 -

court instructed Attorney Kinney to obtain an expert evaluator, and stated that the court would enter a written order. *Id.* at 141. Mother's prior counsel did not oppose the Motion, based on counsel's agreement that the court may determine whether severing the bonds is in the best interest of the Children without an expert assessment. *Id.* at 143. Thus, on January 24, 2019, the trial court entered an Order directing that an assessment should be conducted as to the effect of termination of parental rights on the Children, without a full bonding evaluation as to the existence of any bond, which had been conceded at the hearing. Trial Court Opinion and Order, 1/24/19.

In its Opinion and Order, the trial court emphasized that

the court is granting the request for an evaluation to focus on the negative impact, if any, that the [C]hildren will incur (each child addressed separately) if parental rights are terminated.

It is important to clarify that this evaluation is unusual because normally[, when] an evaluation is undertaken to determine if there is a bond, that would be the first inquiry the evaluator would have. Here, the court has already found, based on the stipulation of counsel and the existing record in this case, that there is a bond with Parents. What is not clear is the long[-]term effect, the emotional harm (if any), that severing that bond(s) would have on the [C]hildren[]; and, if there will be emotional harm caused by severing the bond, [whether] the benefits to the [C]hildren (each child's situation addressed separately) obtaining stability, as in being adopted and having a permanent home, outweigh the negative impact of severing the bond. The evaluator is to consider all potential available options when factoring in the bond that the [C]hildren have with [P]arents, including: 1) termination of both parent' [*sic*] rights and adoption by the foster family – what will be the emotional harm caused by termination and how does that negative effect compare against [the] benefit of being adopted and obtaining permanency? 2) termination of one parent's rights and an order of subsidized legal custodianship [("SPLC")] (physical custody to [F]oster

- 9 -

[P]arents and visits with parent – with the possibility of the custody order being modified in the future). How does the loss of permanency in that the [C]hildren will not be in the custody of a parent for some time, if ever, under this option compare with the benefit of having a continued relationship with a parent?; 3) denial of the request to terminate parental rights regarding each parent and subsidized legal custodianship with the foster family. How does the loss of permanency in this potential option compare against the benefit of having a continued relationship with both parents?

Trial Court Opinion and Order, 1/24/19, at 1-2 (unpaginated).

At the commencement of the May 31, 2019 hearing, Attorney Kinney did not intend to present as a witness the clinical psychologist who had examined the Children pursuant to the January 24, 2019, bonding Order, Peter von Korff, Ph.D. ("Dr. von Korff"). N.T., 5/31/19, at 5.[12] CYS, however, was considering whether to present Dr. von Korff's testimony later in the hearing. *Id.* CYS presented the testimony of Foster Mother. *Id.* at 8. Mother was present with her counsel, and testified on her own behalf. *Id.* at 22. Mother also presented the testimony of Maternal Grandmother. *Id.* at 66-67. Finally, Mother presented the testimony of her eighteen-year-old daughter, K.W. *Id.* at 94-96. At the close of the hearing, the trial court provided CYS additional time to decide whether it would present Dr. von Korff's testimony in a separate hearing. *Id.* at 107. The trial court stated that it would not request a

---

[12] Attorney Kinney contacted Dr. von Korff to conduct the bonding assessment on the Children pursuant to the trial court's January 24, 2019, Order. N.T., 10/4/19, at 14.

recommendation from the GAL until a determination of whether Dr. von Korff would testify. *Id.*

At the hearing on October 4, 2019, CYS proffered the testimony of Dr. von Korff. N.T., 10/4/19, at 5. Mother's counsel, Attorney Clarke, objected on the basis that Dr. von Korff's testimony did not meet the test for admissibility of evidence set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). N.T., 10/4/19, at 5. The following exchange then occurred with the trial court:

[ATTORNEY] CLARKE: …

Preliminarily, I would request that the report and testimony of Dr. von Korff be excluded from these proceedings. My primary thrust would be that it fails to meet the *Frye* test,[13] specifically the report and the testimony that's going to be brought forward today will be produced absent having met with either of the parents or more specifically the parents and/or – and the [C]hildren at the same time and fails to include any of those observations. Personally I've never seen a bonding assessment done that did not incorporate those elements into that bonding assessment and [Dr.] [v]on Korff's report we've -- reaches very sweeping conclusions that there is for all intents and purposes either a weak or insecure bond between [M]other and [the C]hildren. I do not believe from a scientific standpoint he can reach those conclusions without having observed [M]other and [C]hildren interacting in a somewhat natural setting[,] so[,] for those reasons[,] I object to this testimony and/or report being included as part of the record for the court's consideration.

---

[13] *See Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) (adopted in Pennsylvania in *Commonwealth v. Topa*, 369 A.2d 1277 (Pa. 1977)). Under *Frye*, "novel scientific evidence is admissible if the methodology underlying the evidence has general acceptance in the relevant scientific community." *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1043-44 (Pa. 2003).

THE COURT: I'm denying that request. ***Frye*** has to do with -- is it unusual scientific[,] some type of new experiment, something like that. Some procedure not recognized normally -- we get into a ***Frye*** issue. What counsel's [*sic*] arguing is that the evaluation is bad, shouldn't be given weight, should be rejected, which that argument can certainly be made -- I'm not saying whether it's right or wrong, but that's why we have the hearing to – so I can get the facts. Do I accept the evaluation, are there any problems with it, was it done appropriately? Those -- are all things we can get into through the testimony and questioning but it – it – it's not that it's -- again it's a test saying the -- the argument is well[,] this is invalid having these type of bonding assessments[,] so I'm denying the objection.

N.T., 10/4/19, at 5-6.

Thus, the trial court overruled Mother's ***Frye*** test objection, finding it misplaced, and CYS presented Dr. von Korff's testimony. ***Id.*** at 6, 11. The trial court accepted Dr. von Korff as an expert in clinical psychology. ***Id.*** at 13-15. Mother then testified on her own behalf. ***Id.*** at 92.

On October 21, 2019, the trial court entered the Orders presently at issue, which involuntarily terminated Mother's parental rights to each of the Children. On November 12, 2019, Mother timely filed three separate appeals, which this Court, on November 26, 2019, consolidated *sua sponte*. On November 27, 2019, Mother filed separate Concise Statements of errors

complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[14]

On appeal, Mother raises the following claims for our review:

1. Whether the [c]ourt erred in granting [CYS's] Petition[s] for Involuntary Termination of Parental Rights where [M]other showed devotion toward[,] and had a bond with[,] [the] [C]hildren[,] where [M]other was a substantial part of [the] [C]hildren's life prior to a finding of [d]ependency[,] and where [M]other continued to maintain visits with [the [C]hildren after a finding of dependency?

2. Whether the [c]ourt erred in not properly considering the [C]hildren's needs and welfare as it relates to a bond with [M]other[,] and potential harm that may be caused to the [C]hildren by severing said bond[,] particularly as it relates to the two older siblings[, J.B., Jr., and J.B.,] who have clearly stated in the bonding assessment they will not consent to an adoption[?] If the termination of parental rights is not overturned and the [C]hildren are not adopted, they will [e]ffectively be orphaned through the remainder of their childhood[.]

3. Whether the [trial court] erred in permitting the bonding assessment testimony of [Dr. v]on Korff[][?]  The testimony established that the bonding assessment was not properly conducted in that Dr. [v]on Korff never spoke with [ ] [M]other, never observed any interaction of [M]other with [the C]hildren, never spoke with [ ] [Foster Parents], never observed interaction of [F]oster [P]arents with [the C]hildren[,] and based his entire testimony on [a] relatively short interview with the [C]hildren[.]

_____

[14] Mother admitted in her transmittal letter that she had failed to comply with Pa.R.A.P. 1925(a)(2)(i) by failing to file a concise statement of errors complained of on appeal concurrently with each of her Notices of Appeal. Mother filed Concise Statements fifteen days thereafter.  Neither the trial court nor this Court ordered her to file a concise statement on a date certain with which she failed to comply, and there is no assertion of any prejudice.  We, thus, do not quash or dismiss her appeal. **See In re K.T.E.L.**, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that failure to file a Rule 1925(b) statement concurrently with a children's fast track appeal is considered a defective notice of appeal, to be disposed of on a case-by-case basis, but did not result in dismissal or quashal where there was no prejudice to the other parties as a result of the late filing).

Mother's Brief at 3-4.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. **Id.**; **R.I.S.**, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. **Id.**; **see also Samuel Bassett v. Kia Motors America, Inc.**, … 34 A.3d 1, 51 (Pa. 2011); **Christianson v. Ely**, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" **Id.** (quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will address Section 2511(a)(1), (2) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (b).

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of section 2511(b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

Regarding section 2511(b), our Supreme Court has explained as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

- 16 -

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In her brief, Mother does not specifically contest the trial court's findings under 23 Pa.C.S.A. § 2511(a), except insofar as any certain subsection of section (a) also has a "needs and welfare" element. Mother's Brief at 21. Mother explains, "the crux of this case focuses on 23 Pa.C.S.[A.] § 2511(b)." *Id.* As Mother does not discuss any subsection of section 2511(a) in her brief, we find that she has waived any challenge to the termination of her parental rights under section 2511(a). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (recognizing that, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *Chapman-Rolle v. Rolle*, 893 A.2d 770, 774 (Pa. Super. 2006) (stating that "[i]t is well settled that a failure to argue and to cite any authority supporting any argument constitutes a waiver of issues on appeal.") (quoting *Jones v. Jones*, 878 A.2d 86, 90 (Pa. Super. 2005)).[15]

---

[15] Even if Mother had not waived any challenge to section 2511(a), we would conclude that she had conceded that the requirements of subsection (a)(1) and/or (a)(2) were met, as those subsections, unlike subsections (5) and (8), do not have a separate "needs and welfare" element. Further, we would conclude that any challenge to section 2511(a) lacks merit, for the reasons discussed in the trial court's October 17, 2019, Opinion, which we adopt herein. Trial Court Opinion, 10/17/19, at 13-23.

Thus, we proceed to Mother's challenges regarding section 2511(b).  **See**

**C.L.G.**, **supra**.  Mother requests that we address her third issue, her "**Frye**"

issue, before reviewing her remaining issues.  Mother's Brief at 21.  Relying

on **Commonwealth v. Harrell**, 65 A.3d 420, 429 (Pa. Super. 2013), and its

discussion of **Frye**, Mother contends that the trial court erred in admitting Dr.

von Korff's testimony.  Mother's Brief at 23-25.  Mother argues that it is

necessary to determine whether Dr. von Korff's testimony was within the

scope of what the trial court could consider in assessing the effect of severing

the Children's bond with Mother, before we can assess the effect of the

termination on the Children.  **Id.** 21-22.

We agree with CYS and the GAL that Mother has waived the **Frye** issue

by explicitly not renewing her objection to Dr. von Korff's testimony and report

as inadmissible under the **Frye** test.  **See** CYS Brief at 25; GAL's Brief at 23.

Our review discloses that, upon the completion of cross-examination of Dr.

von Korff by Mother's counsel, Attorney Clarke, the trial court questioned

whether Mother continued to object to Dr. von Korff's testimony and report

on the bases of **Frye**.  The following exchange ensued:

> MR. CLARKE: So[,] Your Honor[,] the -- I -- I -- I believe that the
> original objection[,] if I remember correctly[,] was that I objected
> on a **Frye** basis and you also indicated perhaps it goes to the
> weight of the testimony[,] and certainly the court can make that
> determination as to whether or not it goes to the weight of the
> testimony.  **I'm not renewing my objection.**

N.T., 10/4/19, at 60-61 (emphasis added).

- 18 -

This Court has held that issues not raised in the lower court are waived, and cannot be raised for the first time on appeal. ***In re C.P.***, 901 A.2d 516, 522 (Pa. Super. 2006); Pa.R.A.P. 302. As Mother's counsel specifically stated in court, on the record, that Mother was not renewing her ***Frye*** objection, the objection was waived. Further, the trial court did not address this issue in the Opinion that accompanied its October 16, 2019, Orders. We agree that the issue is waived.

Even if Mother had not waived her ***Frye*** challenge, we would conclude that it lacks merit.

At the hearing on October 4, 2019, the trial court explained that Mother's ***Frye*** objection to Dr. von Korff's testimony was misplaced. N.T., 10/4/19, at 5-6. The court stated that Dr. von Korff would not be testifying with regard to an issue about which there was novel scientific methodology. ***Id.*** The trial court had appointed a psychological expert to conduct a bonding assessment to assist the court in assessing, from the standpoint of an expert in psychology, the emotional effect on each of the Children of severing their uncontested bond with Mother. Dr. von Korff carried out the court's Order to assist the court with its inquiry.

Dr. von Korff testified that he was assigned to meet with the Children to offer an opinion with respect to their status of attachment and then any subsequent opinions that he might give in relation to assisting the court to address the Children's permanency. N.T., 10/4/19, at 15. Dr. von Korff

explained that the tools that he used to make his determinations in this case were valuable in assessing attachment; the tools are long-standing instruments in his field and widely used in his profession. *Id.* at 16-17. Thus, had Mother not waived her *Frye* challenge, we would conclude that there was no *Frye* issue as to the methodology that Dr. von Korff had employed. *Id.* at 17.

In the remaining two issues, which Mother addresses together in her brief, Mother asserts that there is a bond between her and the Children, and that the Children will be harmed by terminating her parental rights and severing the bond. Mother's Brief at 25-33. Additionally, she contends that the oldest child, J.B., Jr., who turned twelve in August 2019, does not wish to be adopted, but would like to be reunited with her when she is released from her incarceration.[16] *Id.* at 29-30 (citing N.T., 10/4/19, at 31; N.T., 1/22/19, at 125-26). Mother urges that the middle child, J.B., who will be twelve in June 2020, will likely follow the lead of his older brother and resist adoption, but she concedes his intention is not clear in the record. *Id.* at 29-30 (citing N.T., 10/4/19, at 31-32). Mother asserts that the case law does not favor courts terminating parental rights so that children become "legal orphans." *Id.* at 30-31 (citing *In re Adoption of: L.J.B.*, 18 A.3d 1098, 1107 (Pa.

_____

[16] Mother cites 23 Pa.C.S.A. § 2711 (providing that the consent of an adoptee who is over the age of twelve is required for an adoption).

2011); ***In re E.M.***, 908 A.2d 297, 309 (Pa. Super. 2006)).[17]  Mother requests us to reverse the trial court's Order, and remand the matter for the trial court to order SPLC for the Children with Foster Parents.  ***Id.*** at 34.  Alternatively, Mother asks us to reverse and remand for SPLC with Foster Parents only as to the two older children, J.B., Jr., and J.B., and not as to the youngest child, B.W.  ***Id.***

Dr. von Korff recommended termination of Mother's parental rights as to the Children, opining that SPLC would maintain the status quo, and the status quo had to change.  N.T., 10/4/19, at 31-36; ***see also*** Trial Court Opinion, 10/17/19, at 10-13.  Mother contends that the trial court committed an error of law in admitting Dr. von Korff's bonding assessment, as it varied from the methodology Dr. von Korff normally employed in conducting a bonding evaluation, in that he did not interview the Children and the parents and/or Foster Parents.  N.T., 10/17/19, at 23-25.

With regard to Mother's contentions concerning her remaining two issues, we adopt the Opinion of the trial court, as it fully explains the court's needs and welfare analysis in this case.  ***See*** Trial Court Opinion, 10/17/19, at 13-26.  We find no merit to Mother's argument regarding the potential for the two older children to become legal orphans by their potential refusal to

---

[17] In his brief, the Children's legal interests counsel, Attorney Kinney, echoes the arguments raised by Mother.  CYS and the GAL argue that the trial court's decision was proper and supported by competent evidence in the record.

consent to adoption by Foster Parents. The trial court Opinion discusses ***In the Matter of T.D.***, 949 A.2d 910, 922-23 (Pa. Super. 2008), in which this Court considered ***E.M.***, ***supra***, and also discusses ***In re T.S.M.***, ***supra***, in which our Supreme Court considered ***T.D.*** and ***L.J.B.***, ***supra***.

In ***T.D.***, the panel of this Court concluded that the trial court must give consideration to the particular needs and welfare of the child at issue. ***T.D.***, 949 A.2d at 920. Further, we recognized that creating legal orphans is not desirable. ***Id.*** at 922. The panel in ***T.D.*** held that although the child was twelve years old, still had loyalty and close ties to his natural parents, and there was no pre-adoptive placement readily available, termination would best serve the child's needs and welfare. ***Id.***, at 922-23. ***See*** Trial Court Opinion, 10/17/19, at 17-18.

Likewise, in ***T.S.M.***, our Supreme Court, after considering ***L.J.B.*** and ***T.D.***, explained that

> [o]bviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

***T.S.M.***, 71 A.3d at 269; ***see also*** Trial Court Opinion, 10/17/19, at 20.

Our careful review of the record in this matter discloses that the trial court's determinations are supported by competent evidence. ***In re***

*Adoption of S.P.*, 47 A.3d 826-27. We agree with the trial court that the Children's bond with Mother is impeding their permanency and adoption with Foster Parents, who are willing to adopt them. The termination of Mother's parental rights would be in the best interests of the Children in order to provide them the potential for permanency and stability by being adopted by their pre-adoptive Foster Parents, as recommended by Dr. von Korff. N.T., 10/4/19, at 31-36. *See T.D.*, 949 A.2d at 920-23; *T.S.M.*, 71 A.3d at 269. Accordingly, we affirm the trial court Orders involuntarily terminating Mother's parental rights.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/6/2020

IN THE INTEREST OF:        : IN THE COURT OF COMMON PLEAS OF

J.B. JR.                   : McKEAN COUNTY, PENNSYLVANIA

                         : ORPHAN'S COURT DIVISION

                         : NO. 42-18-0077



**RECEIVED OCT 23 2019 BY: [signature]**

**MEMORANDUM AND ORDER**

McKean County Children and Youth Services (hereinafter "CYS") filed a Petition to Involuntarily Terminate the Parental Rights of A███ W███-B███ (hereinafter "Mother") and J███ B███ Sr. (hereinafter "Father") to J███ B███ Jr. (hereinafter "James"). Several days of hearings have been held and the matter is now ready for a decision.

**FINDINGS OF FACT:**

J███ is 12 years old and his date of birth is August 2, 2007. He has several siblings including J.B., date of birth January 30, 2008; and, B.W., date of birth October 4, 2011. J███ J.B. and B.W. have resided in the T███ and D███ L███ for over three years. Mother and Father are both incarcerated in State Correctional facilities. They both have serious drug and alcohol addictions and numerous prior criminal convictions.

Brianna Jones, an intake supervisor for McKean CYS, testified at the January 22, 2019, termination hearing. She explained that CYS initially became involved due to Father being incarcerated and Mother facing incarceration. Mother had made arrangements for her Mother, C███ D███, and her friend, Karly Ryan, to provide care for her 6 children when she was incarcerated. CYS initially monitored the case / family.

1

However, when Karly Ryan stole rent subsidy money and it appeared that C██ D██ was unable to provide appropriate care and supervision for the children, a dependency petition was filed in April of 2016.

The children were found to be dependent by an Order dated May 17, 2016. At that time Mother had been sentenced to a term of 6 to 13 years.

Father was incarcerated in the McKean County Jail and was facing pending criminal charges and a State Parole revocation. Paternal grandparents, W██ and C██ B██, indicated that they could provide kinship care for the children. Therefore, J██, J.B., and B.W. were placed in their home. C██ and W██ B██ were also providing care for three additional grandchildren who were found to be dependent. Mother had requested visits with the children (at her SCI facility). Visits with Mother have continued since the inception of the dependency action. Mother has maintained regular phone contact with the children. There were no visits with Father while he was incarcerated. Father had limited contact with the children prior to his incarceration. He initially had some phone contact with the children but then that ended.

The placement with the B██ was found, in the initial dependency proceedings, to be going well. However, at the October 18, 2016, hearing the court found that there were serious concerns. Service providers working with the family raised concerns to CYS regarding the treatment of the children in the B██s' home. The B██ had difficulty providing care for all of the children. J██ and his siblings have behavioral issues that the B██ struggled with. The court found that the B██

2

couldn't provide appropriate care for all of the children. Therefore, J██████, J.B. and B.W. were placed in the L███████ foster home.

The L███████s have provided exceptional care for J██████ and his siblings. They have worked with service providers and school staffs to assure that their needs are met. They will adopt the children if that is an option.

At the October 18, 2016, hearing maternal grandmother, C███ D██████, indicated that she was a placement option for J██████ and his siblings. However, Mrs. D██████ had three other grandchildren in her home and there had been issues regarding previous visits there. Services were put in place to assist C███ D██████ with the development of skills and a plan to have all of the children placed in her care.

At the review hearing on January 18, 2017, the court found that the children continued to do well in the Lancaster foster home. C███ D██████ was still requesting that the children be placed with her. However, additional concerns had arisen about the lack of supervision in C███ D██████'s home during the children's weekly visits with Mrs. D██████ and their siblings. C███ D██████ had a hard time controlling and supervising all of the children.

At a review hearing on March 8, 2017, despite the previous emphasis and directives to C███ D██████ not to leave the children unattended during the sibling visits, it was discovered that she continued to do so. A plan was put in place for an additional caregiver to assist C███ D██████ when the children visited her, particularly when she was at work.

3

At the review hearing on September 22, 2017, the court found that there had been a significant and troubling incident during a visit with C██ D████. The children were left alone and B.W. found and took some medication that was prescribed for his grandmother. He had to receive emergency medical treatment. It became evident that, although C██ D████ deeply cares for James and his siblings and they enjoy their relationship with her, she would not be a future placement option for them. Since the children had been in placement for some time the permanency plan for the children was discussed, including the potential of termination and adoption by the L██████s. Father participated in the hearing via telephone. He indicated that he was in the Boot Camp Program and taking advantage of all available treatment options. He indicated he "would do whatever it takes" to have the children in his care and to be part of their lives; and, "I would go to the moon if I have too." The focus at the hearing was on Father as Mother would not be eligible for release from incarceration for several years. The court advised Father that his recent steps to complete his sentence and be in a position to provide care for the children was a positive development. However, the court also specifically advised Father that he would have to demonstrate, through his actions, that there was substance behind his commitment to provide care for J████ and his siblings. Father was ordered to follow his drug and alcohol treatment plan; to maintain contact with CYS and establish a visitation schedule with CYS once he was released from incarceration; to refrain from using controlled substances and alcohol; and, to obtain appropriate housing. If Father was following his reunification plan CYS had discretion to increase his visits and contact with J████ and his brothers.

4

Father was released from incarceration after the September 22, 2017, hearing but before the next review hearing on March 23, 2018. He made little effort to have contact with the children and form a relationship with them after he was released. He missed visits and did not attend their appointments. He would tell the children he was buying them Christmas gifts, or they would have pizza at the next visit, but then not show up. This was traumatic to the children and deeply harmed Father's relationship with them. He tested positive for cocaine use on January 7, 2018. His visits with the children were then suspended. Father had additional positive drug screens for cocaine and Suboxone. He had not obtained appropriate housing. Mother indicated that she believed she would be eligible for parole sometime in 2022.

Father's parole agent, Shawn Hartman, testified at the January 22, 2019, termination hearing. He supervised Father on two separate occasions. He initially supervised him in 2015 or 2016. Father absconded and was again incarcerated. He was then released in December of 2017. Father began utilizing controlled substances shortly after he was released from state incarceration and was, therefore, required by Agent Hartman to attend the Gateway Rehabilitation Center treatment program in Erie, Pennsylvania. He attended that program for two or three weeks and then he left Gateway and absconded. A warrant was placed for his arrest. He was apprehended in August of 2017 at his parents' (W████ and ████ B███'s) residence in Bradford, Pa. He also committed new criminal offenses during this time period. By Order of Court dated June 20, 2019, at case numbers 462 CR 2018, 606 CR 2018 and 30 CR 2019, Father was sentenced to a period of confinement of not less than 4 years to no more than 8 years.

At 30 CR 2019 he pled guilty to Theft by Unlawful Taking, Criminal Trespass and Criminal Mischief. The date that these offenses occurred was June 28-29, 2018. Therefore, after Father indicated at the September 22, 2017, that he would be released from incarceration soon and would "would do whatever it takes" to have the children in his care and to be part of their lives; and, "I would go to the moon if I have too," Father: 1) had little contact with the children; 2) made promises to them that he did not follow through on and which emotionally harmed them; 3) utilized controlled substances; 4) left inpatient treatment; 5) absconded from supervision; and, 6) committed new serious criminal offenses.

J███, J.B. and B.W. have a negative relationship / bond with their Father. This conclusion is consistent with the information provided by the children's' Guardian ad litem, Mark Hollenbeck, Esquire; J███' appointed attorney, Kord Kinney, Esquire; and, Dr. Peter von Korf, an expert called by CYS.

Regarding their relationship with their Mother, former CYS caseworker Donna Trim testified that the children (J███ included) are happy to visit with and see their Mother. They would always run to her. The visits occur once a month at an SCI facility. The children's grandmother, C███ D███, often transports the children to the visits. However, as discussed below, Dr. von Korf testified that the children have an "insecure attachment" with Mother. The court accepts the opinion of Dr. von Korf regarding the classification and concerns regarding the children's relationship with Mother.

Mother testified at the May 31, 2019, termination hearing that she will be eligible for parole from state prison in 30 months. The court does not accept this

6

assertion as fact. As outlined above Mother was sentenced to several periods of consecutive confinement; and, there is nothing in the record definitively establishing the date she is eligible for parole. The court is concerned about Mother providing a clearly self-serving statement about this date and her potential to obtain parole upon her minimum without something more definitive. Mother testified that she is optimistic and, in fact, believes that she will be granted parole upon the expiration of her minimum. Mother could be required to attend a half-way house / treatment program upon her release. Further, it may take her sometime to obtain appropriate housing for the children after she is released. Therefore, at best, it will be several years before Mother is available to have the children in her care. Placing a time period on Mother's parole and availability to have the children in her care, at best, if everything goes well and Mother fully follows her parole plan, it will be in 30 to 36 months. Of course, there is the possibility that Mother will not be granted parole, or, will have set backs if she is. If this occurs it could be much longer until she is available, if at all, to care for the children. Mother testified that she has completed a Family Support Program while incarcerated; and, a domestic violence program phases I, II and II. She is taking classes to obtain her GED.

Mother testified that she has six children, 4 minor children and two adults. Two of Mother's children reside with her mother, C●●D●●, and, J●● and his two brothers reside in the L●●● foster home. Mother had no concerns regarding the care the Lancasters are providing for the children. She thanked them in her testimony for caring for the children and being open to her having contact with them.

7

Mother testified that she and her children would go on "outings" before she was incarcerated, like fishing, camping, swimming, the Erie Zoo. Although the court accepts this testimony as accurate, that Mother did undertake these activities with the children, the court also finds that Mother often left the children with her Mother and others before she was incarcerated. Mother struggled with addiction and would often be out of the home. There were concerns with Mother's care of the children even before she was incarcerated.

When Mother is released she will seek assistance from her Mother, C████ D████, to provide care for the children. The children do have a bond with C██ D████ as they have had regular contact with her for all of their lives. Mother plans on obtaining employment when she is released. She indicated that she enjoys cleaning and would like to get a job doing that. She testified that she will follow her drug and alcohol treatment plan and goals, and, she wants to be actively involved in the children's lives.

Mother's criminal history is summarized as follows:

1) McKean County Criminal Case No. 440 CR 2002. Convicted of Criminal Attempt – Theft by Unlawful Taking (F-3), Forgery (F-3). Sentenced to one year of probation;
2) McKean County Criminal Case No. 371 CR 2004. Convicted of Simple Assault (victim Mother's sister), Reckless Endangerment, Accidents Involving Damage. Sentenced to one year probation;
3) McKean County Criminal Case No. 413 CR 2004. Convicted of Hindering Apprehension, Driving at Safe Speed and Restraint System Violation (not having child properly secured). Sentenced to one year consecutive probation;
4) McKean County Criminal Case No. 263 CR 2005. Convicted of Obstructing the Administration of Law (involving assistance to Father who she knew law enforcement was attempting to apprehend due to him fleeing a facility). Sentenced to 15 days incarceration to 6 months, no contact with Father;
5) McKean County Criminal Case No. 672 CR 2005. Convicted of Perjury, Forgery – Altered Writing, Altered and Forged Counterfeit Documents. Sentenced to 6 to 12 months of incarceration;

8

6) McKean County Criminal Case No. 73 CR 2006. Convicted of Driving Under the Influence. Sentenced to 6 months of consecutive probation;

7) McKean County Criminal Case No. 635 CR 2009. Convicted of Simple Assault. Sentenced to 115 days to 12 months. Parole later revoked at this number for new violations (new DUI and consuming alcohol). Her sentence for the revocation was remanded for the balance of her sentence and eligible for re-parole after serving 45 days;

8) McKean County Criminal Case No. 463 CR 2010. Convicted of Driving Under the Influence – 2nd Offense. Sentenced to 6 months to 3 years in a State Correctional Facility;

9) McKean County Criminal Case No. 126 CR 2015. Convicted of Delivery of Suboxone. Sentenced to 1 to 3 years in a State Correctional Facility;

10) McKean County Criminal Case No. 157 CR 2015. Convicted of Delivery of Amphetamines. Sentenced to 18 months to 36 months consecutive to the sentence at 126 CR of 2015;

11) McKean County Criminal Case No. 158 CR 2015. Convicted of Delivery of Vicodin. Sentence of not less than 18 months to no more than 3 years consecutive to the sentence at 157 CR 2015;

12) McKean County Criminal Case No. 41 CR 2016. Convicted of Criminal Mischief/ Damaging Property and Criminal Trespass / Entering a Structure. Sentenced to 2 years of concurrent probation;

13) McKean County Criminal Case No. 62 CR 2016. Convicted of Simple Assault and Fleeing and Eluding. Sentenced to 2 to 4 years consecutive to the sentence at 158 CR 2015. The victim of the assault was Father.

1-22-19 Hearing Tr. Pages 42 -52. Father's criminal history is even more extensive than Mother's and is outlined in the January Hearing Transcript pages 34 to 43.

J⬛ and his brother J.B. remember residing with their Mother. They have a bond with her. This bond is affected by their relationship with and frequent contact with their maternal grandmother, C⬛D⬛, and their siblings. There is encouragement from the family and extended family to support the hope and goal of the children being back with Mother and into the family unit. This is certainly understandable but it does put J⬛and his siblings in a very difficult position. They care for their Mother and have connection to her and their maternal family, but, they have been residing with the L⬛ for several years and recognize that they have

9

been caring for them and assuring that their needs are met. B.W., due to his age, is in a different position than J████ and J.B. He has limited recollection of being in his Mother's care before she was incarcerated. He is much more bonded to the L██████s than his siblings. J████ and J.B. have behavioral and emotional issues which were likely caused by or enhanced by the lack of stability in their lives. B.W. is not facing these behavioral issues. J████ and J.B. have fully accepted Mother and their maternal grandmother's assertion that Mother will be released from prison and they will be back in her care. The have expressed this belief to their caseworker, to their Guardian ad litem Mark Hollenbeck, Esquire, to their counsel, Kord Kinney, Esquire, and to Dr. von Korf. As discussed elsewhere in this Memorandum, that conclusion may turn out to be unrealistic, but the fact that it is J████ and J.B.'s adamant conclusion / desire has to be recognized and given consideration.

Dr. Peter von Korf's involvement in this case occurred when counsel for James and J.B., Kord Kinney, Esquire, made an oral motion to obtain an expert opinion regarding the relationship / bond between Mother and J████ and J.B. and the potential negative affect of severing that bond. In an Opinion and Order dated January 22, 2019, the court granted the Motion. Attorney Kord Kinney indicated at the May 31, 2019, hearing that he did not intend on calling Dr. von Korf. CYS Solicitor Michele Alfieri-Causer indicated that CYS did intend on calling Dr. von Korf. Therefore, further hearing was held on October 4, 2019.

Regarding Father Dr. von Korf had no difficulty concluding that termination of his parental rights was in the best interests of all 3 children. He indicated that "none of the

10

children expressed any attachment to Father." Any memory they had of him was negative. Therefore, it was his opinion that termination of Father's parental rights was appropriate because it would eliminate concerns / fears that the children have regarding their Father and his potential future contact with them.

Regarding Mother Dr. von Korf's testimony and opinion was different regarding J███ and J.B – and – B.W. It was his opinion that B.W., due to his age, has very limited memory of residing with Mother, has not established a strong attachment to her, and, he has developed a bond with the L█████s because he has been in their care for the last several years. Therefore, he was not concerned about potential negative effects of termination of parental rights for B.W. He recognized that J███ and J.B. have expressed a desire to not have their Mother's parental rights terminated and to work towards returning to her care. J███ and J.B. stated to him, as they have to others: "when my mom gets out of jail we are going to live with her." He found that J███ and J.B. have "affection and fondness" for their Mother, but, their bond with her "is not secure." He testified: "these children had very low scores in terms of parental attachment." He found that J███ and J.B. "have no attachment to an adult;" and, "this is very unusual." Dr. von Korf's "central opinion" was that "these children are insecurely attached to all caregivers in their life;" and, "that circumstance had to have some root in their life." He found the children to be "avoidant children" who "rely heavily on self." He found J.B. to be "depressed, angry – emotional troubled." He found B.W., who again has spent more of his young life with the Lancasters, "in the best circumstance. He is doing the best, best of all 3 to make gains." He went on to explain that "attachments

11

can evolve over time. It can be repaired. They can become familiar with secure attachments." He initially rendered a clear opinion that termination and adoption would give all 3 children the best option to form secure attachments. However, when pressed regarding ██████ and J.B.'s preference to return to their Mother's care his opinion became less confident regarding potential outcomes. He testified that he "hoped" that once parental rights were terminated J█████ and J.B. would be open to adoption by the ██████ and change their positions and agree to it. However, he also admitted that there was no certainty that would occur. Regarding J████ he recognized that he has "unrealistic 12 year old conclusions" regarding reunification with Mother. He agreed that it would be a horrible outcome if J█████ and J.B. did not agree to adoption, they later had resentment regarding the removal of the option of returning to their Mothers care, the L██████s were no longer willing to provide care / a home for them and Mother was not an option because her rights would have been terminated. However, it was also his professional opinion that "the status quo has to change. SPLC (subsidized permanent legal custodianship) would just maintain the status quo."

During cross examination by Parent's Counsel, Dr. von Korf agreed that his evaluation was not as thorough as he would have preferred. He agreed that he had not met with the Parents, which is something he would normally do. He indicated that "we ran out of time," referring to the fact that the time between when he was initial contacted and when the first hearing was held on May 31, 2019, was limited. However, the court found this explanation somewhat questionable because, had he needed more time to complete a more thorough evaluation, the court would have granted it; and, the

12

next hearing after the May 19, 2019, hearing did not commence until October 4, 2019. Nevertheless, the court found Dr. von Korf's analysis to be accurate and of assistance.

## AUTHORITY:

The statutory requirements for termination in this case are as follows:

(a) General rule. -- The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal

13

or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1),(2), (5) and (8).

The grounds for terminating parental rights under Section 2511(a)(2) are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Id. at 340.

In In re Geiger, 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights pursuant to section 2511(a)(2). According to Geiger,

> three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. Id. at 173-174.

In Re R.H., 33 A.2d 95, 100 (Pa.Super. 2011).

When addressing a request to terminate parental rights the Court is required to "[g]ive primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.C. §2511(b). Further, "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. Id.

An inquiry into whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child is a

14

distinct aspect of a termination hearing, to be undertaken only after the statutory requirements of section 2511(a) have been met. Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of a child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The burden of proof upon a petitioner in a termination proceeding is by clear and convincing evidence:

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking termination of parental rights are valid. . . . The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

In the Interest of A.S., 11 A.3d 473, 477 (2010)(citations omitted).

When reviewing the evidence the Court, as the trier of fact, "is likewise free to make all credibility determinations and resolve conflicts in the evidence." Id.

A parent's right to the custody of his or her children is not absolute and has to be balanced against a child's right to have proper parenting:

A parent's basic constitutional right to the custody and rearing of . . . [his] children is converted, upon the failure to fulfill . . . parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent and healthy, safe environment. There is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act . . . This act was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families.

15

**Id.** at 478 (citations omitted).

In In re Adoption of S.P., 47 A.3d 817 (Pa. 2012) the Pennsylvania Supreme Court set forth the standard to utilize when addressing parent's future period of incarceration:

> In line with the expressed opinion of a majority of justices in *R.I.S.,* our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.,* 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); *E.A.P.,* 944 A.2d at 85 (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).' If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia,* how a parent's incarceration will factor into an assessment of the child's best interest.

In re Adoption of S.P., 47 A.3d 817, 830-831 (Pa. 2012). In that case the Superior Court had reversed the trial court, finding that the trial court had given too much weight to the fact that a parent was incarcerated. The Supreme Court reversed the Superior Court holding:

> As applied to this case, we conclude the Superior Court erred in reversing the trial court's decision to terminate Father's parental rights where that decision was supported by the record and did not constitute an abuse of discretion or an error of law. The trial court properly found that Father has been incarcerated since prior to Child's birth and never provided Child with essential parental care. Accordingly, the court did not abuse its discretion in concluding that Father's "repeated and continued incapacity ... caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being." 23 Pa.C.S. § 2511(a)(2). Moreover, the record supports the trial court's findings regarding the uncertainty of Father's parole date and that, even upon parole, Father would reside in a half-way house and would need to obtain housing, employment and transportation in addition to parenting skills. Accordingly, the trial court did not abuse its discretion when it concluded that "the conditions and causes of the incapacity ... cannot or will not be remedied" by Father. 23 Pa.C.S. § 2511(a)(2). Finally, given that Child did not have a relationship with Father, that Father would not be able to provide for her, especially considering her special needs, and that Child had a strong bond

16

with her maternal half-sister, the trial court did not abuse its discretion in concluding that terminating Father's rights would best serve the "developmental, physical and emotional needs and welfare" of Child. 23 Pa.C.S. § 2511(b).

In re Adoption of S.P., 47 A.3d 817, 831 (Pa. 2012). It is important to note that, when conducting their analysis regarding the effect of incarceration, the Supreme Court in In re Adoption of S.P gave consideration to the length of future incarceration and to the quality of the existing relationship between the parent and the trial (finding the relationship was poor thus supporting termination).

In In the Matter of T.D., 949 A.2d 910 (Pa.Super. 2008), the Superior Court addressed the standard to apply when a parent is unavailable, the children have a bond and connection with the parent, and, the children express reluctance to consent to an adoption.

> This Court confronted a similar issue in *In re E.M.*, 908 A.2d 297 (Pa.Super.2006), and reversed the trial court's order terminating a mother's parental rights to her two children. In that case, the trial court determined that the appellant maintained sporadic contact with her two teenage children during placement and she failed to perform her parental duties. *Id.* at 301–302. Nevertheless, the children, who had maintained emotional bonds with their mother, desired to reunify and only would consent to adoption if it were a last resort. *Id.* at 307. Despite the apparent bond, the trial court found that the agency had satisfied the statutory requirements of section 2511(a) and section 2511(b). On appeal, this Court reversed, finding that, under the unique circumstances of that case, the trial court had abused its discretion in concluding that termination served the needs and welfare of the children.

> In reaching its conclusion, this Court reasoned that, given the children's ages, fourteen and fifteen, and the requirement of their consent to adoption, the lack of an identifiable pre-adoptive home, a stable foster home willing to care for them until they reach majority, and the children's commitment to maintaining contact with their mother, even in the face of termination, "the reality is these children most likely will remain in foster care until they reach majority regardless of the outcome of this case." *Id.* at 306–07. Specifically, the court found, "nothing will change whether mother's rights are terminated or not, and the only thing that will be accomplished by termination is that the children will be true orphans.... [T]he children currently have permanency to the fullest extent possible under the circumstances." *Id.* at 309.

17

Later, in *In re K.C.F.*, 928 A.2d 1046 (Pa.Super.2007), this Court distinguished the facts of *In re E.M.* from the facts underlying that case, wherein the appellant argued that her children's ages, eleven, nine, and eight, and the lack of a pre-adoptive home would prevent them from being adopted. As the *In re K.C.F.* Court observed, unlike the children in *In re E.M.*, the three children at issue in *In re K.C.F.*, had not yet reached the age where consent was required for adoption, and two of the children acknowledged that the Mother could not consistently meet their needs. *Id.* at 1053. Similarly, while the remaining child preferred to reunite with his mother, he was not secure in her presence. *Id.* Accordingly, noting that the Juvenile Act does not require pre-adoptive placement as a precondition to termination of parental rights, we found that the mother did not establish that her children's ages would prevent them from being adopted.

The case at bar aligns with *In re K.C.F.* rather than *In re E.M.* Herein, T.D. is only twelve, and although he must consent to adoption, he still is several years from reaching the age of majority. Moreover, his foster placement is uncertain. T.D. has been removed from the pre-adoptive foster home in which he resided since August 2006, and in stark contrast to the children in *In re E.M.*, the record does not indicate that his present foster home, the second since being removed from pre-adoptive care, is committed to caring for him for six years until he is eighteen. Hence, the unique circumstances *923 that compelled our conclusion in *In re E.M.* are absent from this case. As in *In re K.C.F.*, T.D.'s age, loyalty to his natural parents, and apparent lack of an identifiable pre-adoptive placement will not automatically preclude him from attaining permanency after parental rights have been terminated. *See In re K.C.F.*, 928 A.2d 1046. In contrast, however, in light of Parents' demonstrated inability to provide the minimum level of parental care, preserving Mother's and Father's parental right, would foreclose any hope for adoption and condemn T.D. to foster care until he reaches majority. Accordingly, the court did not abuse its discretion in concluding that termination best serves T.D.'s needs and welfare.

In the Matter of T.D., 949 A.2d 910, 922-923 (Pa.Super. 2008).

In In re T.S.M., 71 A.3d 251 (Pa. 2013), the Pennsylvania Supreme Court discussed at

length the weight to be given to the potential of a child's future adoption if parental rights are

terminated:

Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. *See In re K.M.*, 53 A.3d at 791. Indeed in cases where the petitioner is a party standing *in loco parentis*, the statute requires the party to file a report of intention to adopt. 23 Pa.C.S. § 2512(a)(3). Likewise, this Court

18

has noted that a petition to terminate parental rights filed by a biological parent "is only cognizable when it is accompanied by a prospective stepparent's intention to adopt the child," noting that *630 the public policy behind this provision is to prevent "state-created orphans." *In re Adoption of L.J.B.,* 610 Pa. 213, 18 A.3d 1098, 1107–08 n. 11 (2011) (plurality). Notably, however, the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies such as CYF: "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b).

The Superior Court has rejected the suggestion that termination of parental rights is inappropriate when adoption is not imminent and has allowed termination even if it results in the child temporarily being without one or both parents. *See In re C.W.U., Jr.,* 33 A.3d 1, 9 (Pa.Super.2011). Additionally, the Superior Court has observed that termination may improve the likelihood of finding an adoptive home. *See In the Matter of T.D.,* 949 A.2d at 922–23. Indeed, in some cases, a child's bond with a parent, who has proven incapable of caring for the child, may impede the child's ability to attach to a pre-adoptive family who can provide the needed care and stability. *See Id.* at 921; *In re J.F.,* 904 A.2d at 1216. Nonetheless, the Superior Court has expressed concern for terminating parental rights absent a pre-adoptive home especially in the case of an older child, whose consent is needed for adoption, lest the child age out of foster care without any permanent family. *See In the Matter of T.D.,* 949 A.2d at 922. Moreover, members of this Court have opined that the existence of a pre-adoptive home is "an important factor" in termination cases. *In re R.I.S.,* 614 Pa. 275, 36 A.3d 567, 575 (2011) (Saylor, J., concurring). We have questioned whether a grant of termination would require that an "agency must intend subsequent to termination to seek out an adoptive parent." *In re Adoption of L.J.B.,* 18 A.3d at 1107 n. 8. Indeed, decades ago, we opined in *obiter dictum* that an agency may not terminate parental rights absent a contemplated adoption. *In re B.E.,* 474 Pa. 139, 377 A.2d 153, 155 n. 5 (1977). The Office of Children and Family in the Courts, however, recently provided direction in the Dependency *631 Benchbook, "While having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of an eventual adoption." Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* § 12.1 at 126 (2010).

678 As the prior paragraphs reveal, contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination **269 of

19

parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.,* 9 A.3d at 1190 (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

9 In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, *632 requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.,* 9 A.3d at 1186; *In re Adoption of S.E.G.,* 901 A.2d at 1019. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See,* 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).
Considering these statutory purposes, we reject the trial court's suggestion that "the ultimate exception to ASFA time frames should be until a child finds meaningful, loving relationships with a family and committed homes are established." Tr. Ct. Op. at 19. The trial court's suggested exception could swallow the rule, and permanency could be obstructed in cases where children have been unable to form healthy bonds with foster families, potentially as a result of their unhealthy bonds with biological parents who may be undermining their relationship with their foster family. *See, e.g. In the Matter of T.D.,* 949 A.2d at 921; *In re J.F.,* 904 A.2d at 1215–16 (terminating parental rights where

biological parents could not parent child and instead hampered child's ability to bond with foster family and attain stability).

10 Similarly, we question the trial court's use of concurrent planning in this case. We commend the trial court for recognizing that concurrent planning is a best practice, as it allows agencies to provide families with services in hopes of reunification while also preparing for the child's potential adoption. Concurrent **270 planning is especially useful early in *633 the proceedings when it is unclear whether the parents will be able to learn to parent their children. Conversely, we caution that concurrent planning should not be used to prolong instability for children when it becomes clear that parents will be unable to provide their children's basic needs in the near future. Trial courts' use of concurrent planning beyond its useful life can create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents, thus perpetuating the problem of foster care drift. As Dr. Pepe observed in her testimony, the child is conflicted "between loyalty to a biological parent and loyalty to a foster parent, pre-adoptive parent, adoptive parent. When it is clear to the child that they are in their permanent home, then the conflict can diminish, which can result in less disruptive behaviors and a greater sense of security." N.T., 8/31/11, at 107.

While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children. The trial court made valiant efforts to utilize concurrent planning and family group decision making; however, these efforts were inappropriate in a case such as this, where, at the time of the termination hearing, Mother had the benefit of services for over five years without showing the potential of being able to parent the children in any reasonable period of time.

11 In this case, the children have unhealthy bonds to Mother, who is seemingly the root of their manifold psychological and behavioral conditions. Moreover, Mother appears to be interfering with the children's bonding to their foster families, resulting in confusion for the children and further delay in permanency for the children. For example, Ty. M. reported that Mother told him that he would not be adopted and that his foster brothers "were not his brothers." *See* Report of Dr. Pepe, 6/23–30/11, at 5. Dr. Pepe opined that Ty. M. "would naturally have ambivalence regarding adoption given his age [eight] and level of attachment to his biological *634 mother but that her comments could serve to cause increased confusion with the child." *Id.*

Whether or not the children have current bonds to their foster families, there appears to be a "strong likelihood of an eventual adoption." *Pennsylvania Dependency Benchbook* § 12.1 at 126. Indeed, Dr. Pepe specifically recommended adoption for Ty. M., Tai. M., and N. M., N.T., 8/31/11, at 102;

21

Report of Dr. Pepe, 6/23–30/11, at 5; Report of Dr. Pepe, 12/10–2/11, at 31. In regard to Ti. M., Dr. Pepe did not recommend adoption at the time of the evaluation, but nonetheless did not recommend reunification and suggested reduced visitation with Mother. Report of Dr. Pepe, 12/10–2/11, at 28. The youngest child, Tae. M., previously had a very strong and positive bond with his pre-adoptive foster mother who, unfortunately, became ill and unable to care for Tae. M. Report of Dr. Pepe, 12/10–2/11, at 23. While no adoptive home was present at the time of the hearings, one can presume that a permanent home will be found for Tae. M, when he is freed for adoption.

Although we defer to a trial court's determination regarding termination when it is supported by the record, we must reverse the trial court's determination in this case because we find the court's conclusion to be manifestly unreasonable, and thus an abuse of discretion. *In re Adoption of S.P.,* 47 A.3d at 826. In relying upon the **271 mere existence of the bond between Mother and the children, the trial court failed to recognize the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond with Mother, especially as it affected the children's ability to form attachments to foster families who could have provided the necessary love, care and stability that these children have so needed for the past decade. We conclude without hesitation that it best serves their needs and welfare to sever their bond with Mother permanently, in order to permit them to be placed forthwith into healthy, permanent homes. Accordingly, we reverse the Superior Court decision affirming the trial court's denial of termination of parental rights and order the trial court to enter orders terminating Mother's parental *635 rights as to the five children before this Court. We expect this to be done promptly, and we further expect the child welfare agency and court to give this case their utmost attention so that these children have a chance for normal lives. Jurisdiction relinquished.

In re T.S.M., 71 A.3d 251, 268-271 (Pa. 2013).


**DISCUSSION:**

At the conclusion of the termination hearing all of the attorneys indicated that this is a "difficult decision." However, when applicable and controlling authority is applied to the specific proven facts, it is not. It is an emotionally difficult and charged situation / case, but logically applying the appropriate legal standard to the facts clearly and definitively leads to termination of both Parents' parental rights.

22

First, the required statutory factors set forth in 23 Pa.C.S. §2511(a)(1),(2), (5) and (8) have been demonstrated. Parents, due to criminal convictions, substance use / abuse and failure to perform parental duties, have been unavailable for several years. Both are now incarcerated and will be for at least several more years. Therefore, the only potential issue requiring further legal analysis is: Will termination of parental rights best serve the developmental, physical and emotional needs and welfare of the child (addressing each child's situation separately)? When answering this question we are required to: "discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The holding of our Supreme Court in In re T.S.M. compels termination of parental rights in this case, including the following:

> In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes.

In re T.S.M., 71 A.3d 251, 269 (Pa. 2013). After the Supreme Court in In re T.S.M. mandated "courts" to consider "the ticking clock of childhood," they chastised the lower court for not doing so:

> While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children.

23

In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

Regarding Father the children have a negative bond and negative memories of him. He has very little contact with the children. He made promises to the court regarding the efforts that he was going to make upon his release from incarceration. He didn't follow through with any of them. He immediately began utilizing controlled substances when he was released and is now serving a lengthy criminal sentence. Therefore, it is definitely fulfills the needs and welfare of J████and his siblings for Father's parental rights to be terminated.

Mother has been involved in the criminal justice system, consistently and regularly, since 2002. She had numerous periods of local supervision and attempted rehabilitation that resulted in revocations and new convictions / sentences. Her criminal activity only ended when she was incarcerated following the filing of charges in 2016. She has a history of alcohol and drug use / abuse and mental health concerns (mental health evaluations required as part of criminal sentences). There is nothing in the record indicating that Mother has addressed the drug and alcohol and mental health concerns that initially led to her previous criminal convictions and difficulties. Mother did testify that she plans on not falling back into the destructive patterns she had been involved in for at least 14 years prior to 2016. However, there is no evidence that she has completed any drug treatment or mental health programs that would support her assertions.

Mother testified that she and her children would go on "outings" before she was incarcerated, like fishing, camping, swimming, the Erie Zoo. However, this self-serving and rosy analysis of Mother's care and contact with the children prior to her recent period of incarceration does not line up with reality. She was frequently out of the home and involved in activities that were destructive and, at times, resulted in criminal charges. She frequently relied on her mother and others to care for the children. As Dr. von Korf found, James and J.B. "have no attachment to an adult;" and, "this is very unusual." Dr. von Korf's "central opinion" was

24

that "these children are insecurely attached to all caregivers in their life;" and, "that circumstance had to have some root in their life." He found the children to be "avoidant children" who "rely heavily on self."

The court is in agreement with Dr. von Korf's opinion that "the status quo has to change. SPLC (subsidized permanent legal custodianship) would just maintain the status quo." The court accepts this opinion because: it is supported by the facts in this case, the years of instability the children have already gone through and are potentially facing if a major change is not made soon; and, it is supported by applicable legal authority and guidance including the holding in In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

The court recognizes that Parents, and in particular Mother, have and will focus on the preference of J██████and J.B. to reunify with her when she is released from incarceration; and, the affection they have for her. This assertion is emotional, that two boys want to be with their mother, of course, pulls on the heart strings. However, this is a decision that can't be made by emotion and heart strings. It has to be made based on logic and legal analysis. The fact that these young children want to be reunified with their Mother was given weight and consideration, but is outweighed by the reality of the situation. See, In the Matter of T.D., 949 A.2d 910 (Pa.Super. 2008). Mother has had difficulty for years and it is unlikely anything will change even if we wait for several more years for her to be released from incarceration.[1] The clock here has ticked long enough, longer than it should have. No outcome is guaranteed, but, at this point, based on the

---

[1] The court also finds that the children are motivated and encouraged by Mother, their maternal grandmother, C███D████who they have frequent contact with, and other family members, to support and accept the goal and dream of returning to Mother's care. This is further evidence that the status quo is emotionally pulling them in different directions.

25

prior history and the facts and circumstances in this record, by far the best potential for

J▮ and his siblings to obtain permanency and stability is to terminate parental rights

and create the possibility of their adoption by the ▮▮▮s. There is a short window

for taking meaningful action here – and that window is closing rapidly.


WHEREFORE, WE ENTER THE FOLLOWING:

RECEIVED
OCT 21 2019

FILED
BY: *Amy B*

IN THE INTEREST OF:       : IN THE COURT OF COMMON PLEAS OF

B.W.                       : McKEAN COUNTY, PENNSYLVANIA

                              : ORPHAN'S COURT DIVISION

                              : NO. 42-18-0076

## MEMORANDUM AND ORDER

McKean County Children and Youth Services (hereinafter "CYS") filed a Petition to Involuntarily Terminate the Parental Rights of Amber Walker-Bunce (hereinafter "Mother") and J██ B██ Sr. (hereinafter "Father") to B██ W██ (hereinafter "B██"). Several days of hearings have been held and the matter is now ready for a decision.

### FINDINGS OF FACT:

B██ is 8 years old and his date of birth is October 4, 2011. He has several siblings including J.B. Jr., date of birth August 2, 2007; and, J.B. date of birth June 30, 2008. B██ J.B. Jr. and J.B have resided in the T██ and D██ L██ for over three years. Mother and Father are both incarcerated in State Correctional facilities. They both have serious drug and alcohol addictions and numerous prior criminal convictions.

Brianna Jones, an intake supervisor for McKean CYS, testified at the January 22, 2019, termination hearing. She explained that CYS initially became involved due to Father being incarcerated and Mother facing incarceration. Mother had made arrangements for her Mother, C██ D██ and her friend, Karly Ryan, to provide care for her 6 children when she was incarcerated. CYS initially monitored the case / family.

1

However, when Karly Ryan stole rent subsidy money and it appeared that C████ D████ was unable to provide appropriate care and supervision for the children, a dependency petition was filed in April of 2016.

The children were found to be dependent by an Order dated May 17, 2016. At that time Mother had been sentenced to a term of 6 to 13 years.

Father was incarcerated in the McKean County Jail and was facing pending criminal charges and a State Parole revocation. Paternal grandparents, W████ and C███ B███, indicated that they could provide kinship care for the children. Therefore, B███, J.B. and J.B. Jr. were placed in their home. C███ and W████ B███ were also providing care for three additional grandchildren who were found to be dependent. Mother had requested visits with the children (at her SCI facility). Visits with Mother have continued since the inception of the dependency action. Mother has maintained regular phone contact with the children. There were no visits with Father while he was incarcerated. Father had limited contact with the children prior to his incarceration. He initially had some phone contact with the children but then that ended.

The placement with the B███ was found, in the initial dependency proceedings, to be going well. However, at the October 18, 2016, hearing the court found that there were serious concerns. Service providers working with the family raised concerns to CYS regarding the treatment of the children in the B███' home. The B███ had difficulty providing care for all of the children. B███'s siblings have behavioral issues that the B███ struggled with. The court found that the B███

2

couldn't provide appropriate care for all of the children. Therefore, B████, J.B. Jr. and J.B. were placed in the Lancaster foster home.

The L████s have provided exceptional care for B███ and his siblings. They have worked with service providers and school staffs to assure that their needs are met. They will adopt the children if that is an option.

At the October 18, 2016, hearing maternal grandmother, C███D████ indicated that she was a placement option for B███ and his siblings. However, Mrs. D███ had three other grandchildren in her home and there had been issues regarding previous visits there. Services were put in place to assist C███D███ with the development of skills and a plan to have all of the children placed in her care.

At the review hearing on January 18, 2017, the court found that the children continued to do well in the L████ foster home. C███D████ was still requesting that the children be placed with her. However, additional concerns had arisen about the lack of supervision in C███D███'s home during the children's weekly visits with Mrs. D████ and their siblings. C███D███ had a hard time controlling and supervising all of the children.

At a review hearing on March 8, 2017, despite the previous emphasis and directives to C███D███ not to leave the children unattended during the sibling visits, it was discovered that she continued to do so. A plan was put in place for an additional caregiver to assist C███D███ when the children visited her, particularly when she was at work.

At the review hearing on September 22, 2017, the court found that there had been a significant and troubling incident during a visit with C███ D████ The children were left alone and B███ found and took some medication that was prescribed for his grandmother. He had to receive emergency medical treatment. It became evident that, although C███ D████ deeply cares for B███ and his siblings and they enjoy their relationship with her, she would not be a future placement option for them. Since the children had been in placement for some time the permanency plan for the children was discussed, including the potential of termination and adoption by the L██████s. Father participated in the hearing via telephone. He indicated that he was in the Boot Camp Program and taking advantage of all available treatment options. He indicated he "would do whatever it takes" to have the children in his care and to be part of their lives; and, "I would go to the moon if I have too." The focus at the hearing was on Father as Mother would not be eligible for release from incarceration for several years. The court advised Father that his recent steps to complete his sentence and be in a position to provide care for the children was a positive development. However, the court also specifically advised Father that he would have to demonstrate, through his actions, that there was substance behind his commitment to provide care for B███ and his siblings. Father was ordered to follow his drug and alcohol treatment plan; to maintain contact with CYS and establish a visitation schedule with CYS once he was released from incarceration; to refrain from using controlled substances and alcohol; and, to obtain appropriate housing. If Father was following his reunification plan CYS had discretion to increase his visits and contact with B███ and his brothers.

4

Father was released from incarceration after the September 22, 2017, hearing but before the next review hearing on March 23, 2018. He made little effort to have contact with the children and form a relationship with them after he was released. He missed visits and did not attend their appointments. He would tell the children he was buying them Christmas gifts, or they would have pizza at the next visit, but then not show up. This was traumatic to the children and deeply harmed Father's relationship with them. He tested positive for cocaine use on January 7, 2018. His visits with the children were then suspended. Father had additional positive drug screens for cocaine and Suboxone. He had not obtained appropriate housing. Mother indicated that she believed she would be eligible for parole sometime in 2022.

Father's parole agent, Shawn Hartman, testified at the January 22, 2019, termination hearing. He supervised Father on two separate occasions. He initially supervised him in 2015 or 2016. Father absconded and was again incarcerated. He was then released in December of 2017. Father began utilizing controlled substances shortly after he was released from state incarceration and was, therefore, required by Agent Hartman to attend the Gateway Rehabilitation Center treatment program in Erie, Pennsylvania. He attended that program for two or three weeks and then he left Gateway and absconded. A warrant was placed for his arrest. He was apprehended in August of 2017 at his parents' (W███ and G██ B██'s) residence in Bradford, Pa. He also committed new criminal offenses during this time period. By Order of Court dated June 20, 2019, at case numbers 462 CR 2018, 606 CR 2018 and 30 CR 2019, Father was sentenced to a period of confinement of not less than 4 years to no more than 8 years.

5

At 30 CR 2019 he pled guilty to Theft by Unlawful Taking, Criminal Trespass and Criminal Mischief. The date that these offenses occurred was June 28-29, 2018. Therefore, after Father indicated at the September 22, 2017, that he would be released from incarceration soon and would "would do whatever it takes" to have the children in his care and to be part of their lives; and, "I would go to the moon if I have too," Father: 1) had little contact with the children; 2) made promises to them that he did not follow through on and which emotionally harmed them; 3) utilized controlled substances; 4) left inpatient treatment; 5) absconded from supervision; and, 6) committed new serious criminal offenses.

B███ J.B. and J.B. Jr. have a negative relationship / bond with their Father. This conclusion is consistent with the information provided by the children's' Guardian ad litem, Mark Hollenbeck, Esquire; James' appointed attorney, Kord Kinney, Esquire; and, Dr. Peter von Korf, an expert called by CYS.

Regarding their relationship with their Mother, former CYS caseworker Donna Trim testified that the children (B███ included) are happy to visit with and see their Mother. They would always run to her. The visits occur once a month at an SCI facility. The children's grandmother, C███ D███ often transports the children to the visits. However, as discussed below, Dr. von Korf testified that the children have an "insecure attachment" with Mother. The court accepts the opinion of Dr. von Korf regarding the classification and concerns regarding the children's relationship with Mother.

Mother testified at the May 31, 2019, termination hearing that she will be eligible for parole from state prison in 30 months. The court does not accept this

6

assertion as fact. As outlined above Mother was sentenced to several periods of consecutive confinement; and, there is nothing in the record definitively establishing the date she is eligible for parole. The court is concerned about Mother providing a clearly self-serving statement about this date and her potential to obtain parole upon her minimum without something more definitive. Mother testified that she is optimistic and, in fact, believes that she will be granted parole upon the expiration of her minimum. Mother could be required to attend a half-way house / treatment program upon her release. Further, it may take her sometime to obtain appropriate housing for the children after she is released. Therefore, at best, it will be several years before Mother is available to have the children in her care. Placing a time period on Mother's parole and availability to have the children in her care, at best, if everything goes well and Mother fully follows her parole plan, it will be in 30 to 36 months. Of course, there is the possibility that Mother will not be granted parole, or, will have set backs if she is. If this occurs it could be much longer until she is available, if at all, to care for the children. Mother testified that she has completed a Family Support Program while incarcerated; and, a domestic violence program phases I, II and II. She is taking classes to obtain her GED.

Mother testified that she has six children, 4 minor children and two adults. Two of Mother's children reside with her mother, C██D██, and, B██ and his two brothers reside in the L██ foster home. Mother had no concerns regarding the care the L██ are providing for the children. She thanked them in her testimony for caring for the children and being open to her having contact with them.

Mother testified that she and her children would go on "outings" before she was incarcerated, like fishing, camping, swimming, the Erie Zoo. Although the court accepts this testimony as accurate, that Mother did undertake these activities with the children, the court also finds that Mother often left the children with her Mother and others before she was incarcerated. Mother struggled with addiction and would often be out of the home. There were concerns with Mother's care of the children even before she was incarcerated.

When Mother is released she will seek assistance from her Mother, C████ D████ to provide care for the children. The children do have a bond with C████ D████ as they have had regular contact with her for all of their lives. Mother plans on obtaining employment when she is released. She indicated that she enjoys cleaning and would like to get a job doing that. She testified that she will follow her drug and alcohol treatment plan and goals, and, she wants to be actively involved in the children's lives.

Mother's criminal history is summarized as follows:

1) McKean County Criminal Case No. 440 CR 2002. Convicted of Criminal Attempt – Theft by Unlawful Taking (F-3), Forgery (F-3). Sentenced to one year of probation;
2) McKean County Criminal Case No. 371 CR 2004. Convicted of Simple Assault (victim Mother's sister), Reckless Endangerment, Accidents Involving Damage. Sentenced to one year probation;
3) McKean County Criminal Case No. 413 CR 2004. Convicted of Hindering Apprehension, Driving at Safe Speed and Restraint System Violation (not having child properly secured). Sentenced to one year consecutive probation;
4) McKean County Criminal Case No. 263 CR 2005. Convicted of Obstructing the Administration of Law (involving assistance to Father who she knew law enforcement was attempting to apprehend due to him fleeing a facility). Sentenced to 15 days incarceration to 6 months, no contact with Father;
5) McKean County Criminal Case No. 672 CR 2005. Convicted of Perjury, Forgery – Altered Writing, Altered and Forged Counterfeit Documents. Sentenced to 6 to 12 months of incarceration;

8

6) McKean County Criminal Case No. 73 CR 2006. Convicted of Driving Under the Influence. Sentenced to 6 months of consecutive probation;

7) McKean County Criminal Case No. 635 CR 2009. Convicted of Simple Assault. Sentenced to 115 days to 12 months. Parole later revoked at this number for new violations (new DUI and consuming alcohol). Her sentence for the revocation was remanded for the balance of her sentence and eligible for re-parole after serving 45 days;

8) McKean County Criminal Case No. 463 CR 2010. Convicted of Driving Under the Influence – 2nd Offense. Sentenced to 6 months to 3 years in a State Correctional Facility;

9) McKean County Criminal Case No. 126 CR 2015. Convicted of Delivery of Suboxone. Sentenced to 1 to 3 years in a State Correctional Facility;

10) McKean County Criminal Case No. 157 CR 2015. Convicted of Delivery of Amphetamines. Sentenced to 18 months to 36 months consecutive to the sentence at 126 CR of 2015;

11) McKean County Criminal Case No. 158 CR 2015. Convicted of Delivery of Vicodin. Sentence of not less than 18 months to no more than 3 years consecutive to the sentence at 157 CR 2015;

12) McKean County Criminal Case No. 41 CR 2016. Convicted of Criminal Mischief/ Damaging Property and Criminal Trespass / Entering a Structure. Sentenced to 2 years of concurrent probation;

13) McKean County Criminal Case No. 62 CR 2016. Convicted of Simple Assault and Fleeing and Eluding. Sentenced to 2 to 4 years consecutive to the sentence at 158 CR 2015. The victim of the assault was Father.

1-22-19 Hearing Tr. Pages 42 -52. Father's criminal history is even more extensive than Mother's and is outlined in the January Hearing Transcript pages 34 to 43.

J.B. and his brother J.B. Jr. remember residing with their Mother. They have a bond with her. This bond is affected by their relationship with and frequent contact with their maternal grandmother, C█████D█████, and their siblings. There is encouragement from the family and extended family to support the hope and goal of the children being back with Mother and into the family unit. This is certainly understandable but it does put J.B. and J.B. Jr. in a very difficult position. They care for and remember their Mother and have connection to her and their maternal family, but,

9

they have been residing with the L██████s for several years and recognize that they have been caring for them and assuring that their needs are met.

B███, due to his age, is in a different position than J.B. and J.B. Jr. He has limited recollection of being in his Mother's care before she was incarcerated. He is much more bonded to the L██████s than his siblings. J.B. and J.B. Jr. have behavioral and emotional issues which were likely caused by or enhanced by the lack of stability in their lives. B███is not facing these behavioral issues. J.B. and J.B. Jr. have fully accepted Mother and their maternal grandmother's assertion that Mother will be released from prison and they will be back in her care. The have expressed this belief to their caseworker, to their Guardian ad litem Mark Hollenbeck, Esquire, to their counsel, Kord Kinney, Esquire, and to Dr. von Korf. As discussed elsewhere in this Memorandum, that conclusion may turn out to be unrealistic, but the fact that it is J.B. and J.B.'s Jr.'s adamant conclusion / desire has to be recognized and given consideration.

Dr. Peter von Korf's involvement in this case occurred when counsel for J.B. and J.B. Jr., Kord Kinney, Esquire, made an oral motion to obtain an expert opinion regarding the relationship / bond between Mother and J.B. and J.B. Jr. and the potential negative affect of severing that bond. In an Opinion and Order dated January 22, 2019, the court granted the Motion. Attorney Kord Kinney indicated at the May 31, 2019, hearing that he did not intend on calling Dr. von Korf. CYS Solicitor Michele Alfieri-Causer indicated that CYS did intend on calling Dr. von Korf. Therefore, further hearing was held on October 4, 2019.

10

Regarding Father Dr. von Korf had no difficulty concluding that termination of his parental rights was in the best interests of all 3 children. He indicated that "none of the children expressed any attachment to Father." Any memory they had of him was negative. Therefore, it was his opinion that termination of Father's parental rights was appropriate because it would eliminate concerns / fears that the children have regarding their Father and his potential future contact with them.

Regarding Mother Dr. von Korf's testimony and opinion was different regarding J.B. and J.B Jr. – and – ██████ It was his opinion that ██████, due to his age, has very limited memory of residing with Mother, has not established a strong attachment to her, and, he has developed a bond with the L██████'s because he has been in their care for the last several years. Therefore, he was not concerned about potential negative effects of termination of parental rights for ██████ He recognized that J.B. and J.B. Jr. have expressed a desire to not have their Mother's parental rights terminated and to work towards returning to her care. J.B. and J.B. Jr. stated to him, as they have to others: "when my mom gets out of jail we are going to live with her." He found that J.B. and J.B. Jr. have "affection and fondness" for their Mother, but, their bond with her "is not secure." He testified: "these children had very low scores in terms of parental attachment." He found that J.B. and J.B. Jr. "have no attachment to an adult;" and, "this is very unusual." Dr. von Korf's "central opinion" was that "these children are insecurely attached to all caregivers in their life;" and, "that circumstance had to have some root in their life." He found the children to be "avoidant children" who "rely heavily on self." He found J.B. to be "depressed, angry – emotional troubled." He found B██████ who

11

again has spent more of his young life with the L███████s, "in the best circumstance. He is doing the best, best of all 3 to make gains." He went on to explain that "attachments can evolve over time. It can be repaired. They can become familiar with secure attachments." He initially rendered a clear opinion that termination and adoption would give all 3 children the best option to form secure attachments. However, when pressed regarding J.B. and J.B. Jr.'s preference to return to their Mother's care his opinion became less confident regarding potential outcomes. He testified that he "hoped" that once parental rights were terminated J.B. and J.B. Jr. would be open to adoption by the L███████s and change their positions and agree to it. However, he also admitted that there was no certainty that would occur. Regarding J.B. Jr. he recognized that he has "unrealistic 12 year old conclusions" regarding reunification with Mother. He agreed that it would be a horrible outcome if J.B. and J.B. Jr. did not agree to adoption, they later had resentment regarding the removal of the option of returning to their Mothers care, the L███████s were no longer willing to provide care / a home for them and Mother was not an option because her rights would have been terminated. However, it was also his professional opinion that "the status quo has to change. SPLC (subsidized permanent legal custodianship) would just maintain the status quo."

During cross examination by Parent's Counsel, Dr. von Korf agreed that his evaluation was not as thorough as he would have preferred. He agreed that he had not met with the Parents, which is something he would normally do. He indicated that "we ran out of time," referring to the fact that the time between when he was initial contacted and when the first hearing was held on May 31, 2019, was limited. However,

12

the court found this explanation somewhat questionable because, had he needed more time to complete a more thorough evaluation, the court would have granted it; and, the next hearing after the May 19, 2019, hearing did not commence until October 4, 2019. Nevertheless, the court found Dr. von Korf's analysis to be accurate and of assistance.

## AUTHORITY:

The statutory requirements for termination in this case are as follows:

> (a) **General rule.** -- The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.
>
> . . .

13

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1),(2), (5) and (8).

The grounds for terminating parental rights under Section 2511(a)(2) are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Id. at 340.

In In re Geiger, 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights pursuant to section 2511(a)(2). According to Geiger,

three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. Id. at 173-174.

In Re R.H., 33 A.2d 95, 100 (Pa.Super. 2011).

When addressing a request to terminate parental rights the Court is required to "[g]ive primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.C. §2511(b). Further, "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. Id.

14

An inquiry into whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child is a distinct aspect of a termination hearing, to be undertaken only after the statutory requirements of section 2511(a) have been met. Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of a child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The burden of proof upon a petitioner in a termination proceeding is by clear and convincing evidence:

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking termination of parental rights are valid. . . . The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

In the Interest of A.S., 11 A.3d 473, 477 (2010)(citations omitted).

When reviewing the evidence the Court, as the trier of fact, "is likewise free to make all credibility determinations and resolve conflicts in the evidence." Id.

A parent's right to the custody of his or her children is not absolute and has to be balanced against a child's right to have proper parenting:

A parent's basic constitutional right to the custody and rearing of . . . [his] children is converted, upon the failure to fulfill . . . parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent and healthy, safe environment. There is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act . . . This act was designed to curb an inappropriate focus on

15

protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families.

Id. at 478 (citations omitted).

In In re Adoption of S.P., 47 A.3d 817 (Pa. 2012) the Pennsylvania Supreme Court set forth the standard to utilize when addressing parent's future period of incarceration:

> In line with the expressed opinion of a majority of justices in *R.I.S.*, our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *See e.g. Adoption of J.J.*, 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); *E.A.P.*, 944 A.2d at 85 (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).' If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia,* how a parent's incarceration will factor into an assessment of the child's best interest.

In re Adoption of S.P., 47 A.3d 817, 830-831 (Pa. 2012). In that case the Superior Court had reversed the trial court, finding that the trial court had given too much weight to the fact that a parent was incarcerated. The Supreme Court reversed the Superior Court holding:

> As applied to this case, we conclude the Superior Court erred in reversing the trial court's decision to terminate Father's parental rights where that decision was supported by the record and did not constitute an abuse of discretion or an error of law. The trial court properly found that Father has been incarcerated since prior to Child's birth and never provided Child with essential parental care. Accordingly, the court did not abuse its discretion in concluding that Father's "repeated and continued incapacity ... caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being." 23 Pa.C.S. § 2511(a)(2). Moreover, the record supports the trial court's findings regarding the uncertainty of Father's parole date and that, even upon parole, Father would reside in a half-way house and would need to obtain housing, employment and transportation in addition to parenting skills. Accordingly, the trial court did not abuse

16

its discretion when it concluded that "the conditions and causes of the incapacity ... cannot or will not be remedied" by Father. 23 Pa.C.S. § 2511(a)(2). Finally, given that Child did not have a relationship with Father, that Father would not be able to provide for her, especially considering her special needs, and that Child had a strong bond with her maternal half-sister, the trial court did not abuse its discretion in concluding that terminating Father's rights would best serve the "developmental, physical and emotional needs and welfare" of Child. 23 Pa.C.S. § 2511(b).

In re Adoption of S.P., 47 A.3d 817, 831 (Pa. 2012). It is important to note that, when conducting their analysis regarding the effect of incarceration, the Supreme Court in In re Adoption of S.P gave consideration to the length of future incarceration and to the quality of the existing relationship between the parent and the trial (finding the relationship was poor thus supporting termination).

In In the Matter of T.D., 949 A.2d 910 (Pa.Super. 2008), the Superior Court addressed the standard to apply when a parent is unavailable, the children have a bond and connection with the parent, and, the children express reluctance to consent to an adoption.

This Court confronted a similar issue in In re E.M., 908 A.2d 297 (Pa.Super.2006), and reversed the trial court's order terminating a mother's parental rights to her two children. In that case, the trial court determined that the appellant maintained sporadic contact with her two teenage children during placement and she failed to perform her parental duties. Id. at 301–302. Nevertheless, the children, who had maintained emotional bonds with their mother, desired to reunify and only would consent to adoption if it were a last resort. Id. at 307. Despite the apparent bond, the trial court found that the agency had satisfied the statutory requirements of section 2511(a) and section 2511(b). On appeal, this Court reversed, finding that, under the unique circumstances of that case, the trial court had abused its discretion in concluding that termination served the needs and welfare of the children.

In reaching its conclusion, this Court reasoned that, given the children's ages, fourteen and fifteen, and the requirement of their consent to adoption, the lack of an identifiable pre-adoptive home, a stable foster home willing to care for them until they reach majority, and the children's commitment to maintaining contact with their mother, even in the face of termination, "the reality is these children most likely will remain in foster care until they reach majority regardless of the outcome of this case." Id. at 306–07. Specifically, the court found, "nothing will change whether mother's rights are terminated or not, and the only thing that will be accomplished by termination is that the children will be

17

true orphans.... [T]he children currently have permanency to the fullest extent possible under the circumstances." *Id.* at 309.

Later, in *In re K.C.F.,* 928 A.2d 1046 (Pa.Super.2007), this Court distinguished the facts of *In re E.M.* from the facts underlying that case, wherein the appellant argued that her children's ages, eleven, nine, and eight, and the lack of a pre-adoptive home would prevent them from being adopted. As the *In re K.C.F.* Court observed, unlike the children in *In re E.M.,* the three children at issue in *In re K.C.F.,* had not yet reached the age where consent was required for adoption, and two of the children acknowledged that the Mother could not consistently meet their needs. *Id.* at 1053. Similarly, while the remaining child preferred to reunite with his mother, he was not secure in her presence. *Id.* Accordingly, noting that the Juvenile Act does not require pre-adoptive placement as a precondition to termination of parental rights, we found that the mother did not establish that her children's ages would prevent them from being adopted.

The case at bar aligns with *In re K.C.F.* rather than *In re E.M.* Herein, T.D. is only twelve, and although he must consent to adoption, he still is several years from reaching the age of majority. Moreover, his foster placement is uncertain. T.D. has been removed from the pre-adoptive foster home in which he resided since August 2006, and in stark contrast to the children in *In re E.M.,* the record does not indicate that his present foster home, the second since being removed from pre-adoptive care, is committed to caring for him for six years until he is eighteen. Hence, the unique circumstances *923 that compelled our conclusion in *In re E.M.* are absent from this case. As in *In re K.C.F.,* T.D.'s age, loyalty to his natural parents, and apparent lack of an identifiable pre-adoptive placement will not automatically preclude him from attaining permanency after parental rights have been terminated. *See In re K.C.F.,* 928 A.2d 1046. In contrast, however, in light of Parents' demonstrated inability to provide the minimum level of parental care, preserving Mother's and Father's parental right, would foreclose any hope for adoption and condemn T.D. to foster care until he reaches majority. Accordingly, the court did not abuse its discretion in concluding that termination best serves T.D.'s needs and welfare.

In the Matter of T.D., 949 A.2d 910, 922-923 (Pa.Super. 2008).

In In re T.S.M., 71 A.3d 251 (Pa. 2013), the Pennsylvania Supreme Court discussed at length the weight to be given to the potential of a child's future adoption if parental rights are terminated:

Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond

18

with their foster parents. *See In re K.M.,* 53 A.3d at 791. Indeed in cases where the petitioner is a party standing *in loco parentis,* the statute requires the party to file a report of intention to adopt. 23 Pa.C.S. § 2512(a)(3). Likewise, this Court has noted that a petition to terminate parental rights filed by a biological parent "is only cognizable when it is accompanied by a prospective stepparent's intention to adopt the child," noting that *630 the public policy behind this provision is to prevent " state-created orphans." *In re Adoption of L.J.B.,* 610 Pa. 213, 18 A.3d 1098, 1107–08 n. 11 (2011) (plurality). Notably, however, the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies such as CYF: "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b).

The Superior Court has rejected the suggestion that termination of parental rights is inappropriate when adoption is not imminent and has allowed termination even if it results in the child temporarily being without one or both parents. *See In re C.W.U., Jr.,* 33 A.3d 1, 9 (Pa.Super.2011). Additionally, the Superior Court has observed that termination may improve the likelihood of finding an adoptive home. *See In the Matter of T.D.,* 949 A.2d at 922–23. Indeed, in some cases, a child's bond with a parent, who has proven incapable of caring for the child, may impede the child's ability to attach to a pre-adoptive family who can provide the needed care and stability. *See Id.* at 921; *In re J.F.,* 904 A.2d at 1216. Nonetheless, the Superior Court has expressed concern for terminating parental rights absent a pre-adoptive home especially in the case of an older child, whose consent is needed for adoption, lest the child age out of foster care without any permanent family. *See In the Matter of T.D.,* 949 A.2d at 922. Moreover, members of this Court have opined that the existence of a pre-adoptive home is "an important factor" in termination cases. *In re R.I.S.,* 614 Pa. 275, 36 A.3d 567, 575 (2011) (Saylor, J., concurring). We have questioned whether a grant of termination would require that an "agency must intend subsequent to termination to seek out an adoptive parent." *In re Adoption of L.J.B.,* 18 A.3d at 1107 n. 8. Indeed, decades ago, we opined in *obiter dictum* that an agency may not terminate parental rights absent a contemplated adoption. *In re B.E.,* 474 Pa. 139, 377 A.2d 153, 155 n. 5 (1977). The Office of Children and Family in the Courts, however, recently provided direction in the Dependency *631 Benchbook, "While having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of an eventual adoption." Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* § 12.1 at 126 (2010).

678 As the prior paragraphs reveal, contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a

19

strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination **269 of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.,* 9 A.3d at 1190 (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

9 In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, *632 requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.,* 9 A.3d at 1186; *In re Adoption of S.E.G.,* 901 A.2d at 1019. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See,* 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months). Considering these statutory purposes, we reject the trial court's suggestion that "the ultimate exception to ASFA time frames should be until a child finds meaningful, loving relationships with a family and committed homes are established." Tr. Ct. Op. at 19. The trial court's suggested exception could swallow the rule, and permanency could be obstructed in cases where children have been unable to form healthy bonds with foster families, potentially as a result of their unhealthy bonds with biological parents who may be undermining

20

their relationship with their foster family. *See, e.g. In the Matter of T.D.*, 949 A.2d at 921; *In re J.F.*, 904 A.2d at 1215–16 (terminating parental rights where biological parents could not parent child and instead hampered child's ability to bond with foster family and attain stability).

10 Similarly, we question the trial court's use of concurrent planning in this case. We commend the trial court for recognizing that concurrent planning is a best practice, as it allows agencies to provide families with services in hopes of reunification while also preparing for the child's potential adoption. Concurrent **270 planning is especially useful early in *633 the proceedings when it is unclear whether the parents will be able to learn to parent their children. Conversely, we caution that concurrent planning should not be used to prolong instability for children when it becomes clear that parents will be unable to provide their children's basic needs in the near future. Trial courts' use of concurrent planning beyond its useful life can create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents, thus perpetuating the problem of foster care drift. As Dr. Pepe observed in her testimony, the child is conflicted "between loyalty to a biological parent and loyalty to a foster parent, pre-adoptive parent, adoptive parent. When it is clear to the child that they are in their permanent home, then the conflict can diminish, which can result in less disruptive behaviors and a greater sense of security." N.T., 8/31/11, at 107.

While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children. The trial court made valiant efforts to utilize concurrent planning and family group decision making; however, these efforts were inappropriate in a case such as this, where, at the time of the termination hearing, Mother had the benefit of services for over five years without showing the potential of being able to parent the children in any reasonable period of time.

11 In this case, the children have unhealthy bonds to Mother, who is seemingly the root of their manifold psychological and behavioral conditions. Moreover, Mother appears to be interfering with the children's bonding to their foster families, resulting in confusion for the children and further delay in permanency for the children. For example, Ty. M. reported that Mother told him that he would not be adopted and that his foster brothers "were not his brothers." *See* Report of Dr. Pepe, 6/23–30/11, at 5. Dr. Pepe opined that Ty. M. "would naturally have ambivalence regarding adoption given his age [eight] and level of attachment to his biological *634 mother but that her comments could serve to cause increased confusion with the child." *Id.*

Whether or not the children have current bonds to their foster families, there appears to be a "strong likelihood of an eventual adoption." *Pennsylvania*

21

*Dependency Benchbook* § 12.1 at 126. Indeed, Dr. Pepe specifically recommended adoption for Ty. M., Tai. M., and N. M., N.T., 8/31/11, at 102; Report of Dr. Pepe, 6/23–30/11, at 5; Report of Dr. Pepe, 12/10–2/11, at 31. In regard to Ti. M., Dr. Pepe did not recommend adoption at the time of the evaluation, but nonetheless did not recommend reunification and suggested reduced visitation with Mother. Report of Dr. Pepe, 12/10–2/11, at 28. The youngest child, Tae. M., previously had a very strong and positive bond with his pre-adoptive foster mother who, unfortunately, became ill and unable to care for Tae. M. Report of Dr. Pepe, 12/10–2/11, at 23. While no adoptive home was present at the time of the hearings, one can presume that a permanent home will be found for Tae. M, when he is freed for adoption.

Although we defer to a trial court's determination regarding termination when it is supported by the record, we must reverse the trial court's determination in this case because we find the court's conclusion to be manifestly unreasonable, and thus an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826. In relying upon the **271 mere existence of the bond between Mother and the children, the trial court failed to recognize the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond with Mother, especially as it affected the children's ability to form attachments to foster families who could have provided the necessary love, care and stability that these children have so needed for the past decade. We conclude without hesitation that it best serves their needs and welfare to sever their bond with Mother permanently, in order to permit them to be placed forthwith into healthy, permanent homes. Accordingly, we reverse the Superior Court decision affirming the trial court's denial of termination of parental rights and order the trial court to enter orders terminating Mother's parental *635 rights as to the five children before this Court. We expect this to be done promptly, and we further expect the child welfare agency and court to give this case their utmost attention so that these children have a chance for normal lives. Jurisdiction relinquished.

In re T.S.M., 71 A.3d 251, 268-271 (Pa. 2013).


## DISCUSSION:

At the conclusion of the termination hearing all of the attorneys indicated that this is a

"difficult decision." However, when applicable and controlling authority is applied to the

specific proven facts, it is not. It is an emotionally difficult and charged situation / case, but

22

logically applying the appropriate legal standard to the facts clearly and definitively leads to termination of both Parents' parental rights.

First, the required statutory factors set forth in 23 Pa.C.S. §2511(a)(1),(2), (5) and (8) have been demonstrated. Parents, due to criminal convictions, substance use / abuse and failure to perform parental duties, have been unavailable for several years. Both are now incarcerated and will be for at least several more years. Therefore, the only potential issue requiring further legal analysis is: Will termination of parental rights best serve the developmental, physical and emotional needs and welfare of the child (addressing each child's situation separately)? When answering this question we are required to: "discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The holding of our Supreme Court in In re T.S.M. compels termination of parental rights in this case, including the following:

> In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes.

In re T.S.M., 71 A.3d 251, 269 (Pa. 2013). After the Supreme Court in In re T.S.M. mandated "courts" to consider "the ticking clock of childhood," they chastised the lower court for not doing so:

23

While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children.

In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

Regarding Father the children have a negative bond and negative memories of him. He has very little contact with the children. He made promises to the court regarding the efforts that he was going to make upon his release from incarceration. He didn't follow through with any of them. He immediately began utilizing controlled substances when he was released and is now serving a lengthy criminal sentence. Therefore, it is definitely fulfills the needs and welfare of B█████and his siblings for Father's parental rights to be terminated.

Mother has been involved in the criminal justice system, consistently and regularly, since 2002. She had numerous periods of local supervision and attempted rehabilitation that resulted in revocations and new convictions / sentences. Her criminal activity only ended when she was incarcerated following the filing of charges in 2016. She has a history of alcohol and drug use / abuse and mental health concerns (mental health evaluations required as part of criminal sentences). There is nothing in the record indicating that Mother has addressed the drug and alcohol and mental health concerns that initially led to her previous criminal convictions and difficulties. Mother did testify that she plans on not falling back into the destructive patterns she had been involved in for at least 14 years prior to 2016. However, there is no evidence that she has completed any drug treatment or mental health programs that would support her assertions.

Mother testified that she and her children would go on "outings" before she was incarcerated, like fishing, camping, swimming, the Erie Zoo. However, this self-serving and rosy analysis of Mother's care and contact with the children prior to her recent period of incarceration does not line up with reality. She was frequently out of the home and involved in

24

activities that were destructive and, at times, resulted in criminal charges. She frequently relied on her mother and others to care for the children. As Dr. von Korf found, J.B. and J.B. Jr. "have no attachment to an adult;" and, "this is very unusual." Dr. von Korf's "central opinion" was that "these children are insecurely attached to all caregivers in their life;" and, "that circumstance had to have some root in their life." He found the children to be "avoidant children" who "rely heavily on self."

The court is in agreement with Dr. von Korf's opinion that "the status quo has to change. SPLC (subsidized permanent legal custodianship) would just maintain the status quo." The court accepts this opinion because: it is supported by the facts in this case, the years of instability the children have already gone through and are potentially facing if a major change is not made soon; and, it is supported by applicable legal authority and guidance including the holding in In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

The court recognizes that Parents, and in particular Mother, have and will focus on the preference of J.B. and J.B. Jr. to reunify with her when she is released from incarceration; and, the affection they have for her. This assertion is emotional, that two boys want to be with their mother, of course, pulls on the heart strings. However, this is a decision that can't be made by emotion and heart strings. It has to be made based on logic and legal analysis. The fact that these young children want to be reunified with their Mother was given weight and consideration, but is outweighed by the reality of the situation. *See, In the Matter of T.D.,* 949 A.2d 910 (Pa.Super. 2008). Mother has had difficulty for years and it is unlikely anything will change even if we wait for several more

25

years for her to be released from incarceration.[1] The clock here has ticked long enough, longer than it should have. No outcome is guaranteed, but, at this point, based on the prior history and the facts and circumstances in this record, by far the best potential for B████ and his siblings to obtain permanency and stability is to terminate parental rights and create the possibility of their adoption by the L██████s. There is a short window for taking meaningful action here – and that window is closing rapidly.

WHEREFORE, WE ENTER THE FOLLOWING:

---

[1] The court also finds that the children are motivated and encouraged by Mother, their maternal grandmother, C███ D████, who they have frequent contact with, and other family members, to support and accept the goal and dream of returning to Mother's care. This is further evidence that the status quo is emotionally pulling them in different directions.

IN THE INTEREST OF:                          : IN THE COURT OF COMMON PLEAS OF  FILED

J.B.                                         : McKEAN COUNTY, PENNSYLVANIA

                                             : ORPHAN'S COURT DIVISION      2019 OCT 17 P 2: 15

                          : NO. 42-18-0078

                                             MEMORANDUM AND ORDER

McKean County Children and Youth Services (hereinafter "CYS") filed a Petition to

Involuntarily Terminate the Parental Rights of A████ W███-B███(hereinafter "Mother") and

J███ B███ Sr. (hereinafter "Father") to J███ B███(hereinafter "J██"). Several days of

hearings have been held and the matter is now ready for a decision.

**FINDINGS OF FACT:**

J██ is 11 years old and his date of birth is June 30, 2008. He has several

siblings including J.B. Jr., date of birth August 2, 2007; and, B.W., date of birth October

4, 2011. J██ J.B. Jr. and B.W. have resided in the T███ and D███ L███ for

over three years. Mother and Father are both incarcerated in State Correctional

facilities. They both have serious drug and alcohol addictions and numerous prior

criminal convictions.

Brianna Jones, an intake supervisor for McKean CYS, testified at the January 22,

2019, termination hearing. She explained that CYS initially became involved due to

Father being incarcerated and Mother facing incarceration. Mother had made

arrangements for her Mother, C███ D███, and her friend, Karly Ryan, to provide care

for her 6 children when she was incarcerated. CYS initially monitored the case / family.

1

However, when Karly Ryan stole rent subsidy money and it appeared that ████ D████ was unable to provide appropriate care and supervision for the children, a dependency petition was filed in April of 2016.

The children were found to be dependent by an Order dated May 17, 2016. At that time Mother had been sentenced to a term of 6 to 13 years.

Father was incarcerated in the McKean County Jail and was facing pending criminal charges and a State Parole revocation. Paternal grandparents, V████ and C██ B████, indicated that they could provide kinship care for the children. Therefore, J████, J.B. Jr. and B.W. were placed in their home. C██ and V████ B████ were also providing care for three additional grandchildren who were found to be dependent. Mother had requested visits with the children (at her SCI facility). Visits with Mother have continued since the inception of the dependency action. Mother has maintained regular phone contact with the children. There were no visits with Father while he was incarcerated. Father had limited contact with the children prior to his incarceration. He initially had some phone contact with the children but then that ended.

The placement with the B████s was found, in the initial dependency proceedings, to be going well. However, at the October 18, 2016, hearing the court found that there were serious concerns. Service providers working with the family raised concerns to CYS regarding the treatment of the children in the B████s' home. The B████s had difficulty providing care for all of the children. J████ and his siblings have behavioral issues that the Bunces struggled with. The court found that the B████

2

couldn't provide appropriate care for all of the children. Therefore, J████, J.B. Jr. and B.W. were placed in the L████ foster home.

The L████s have provided exceptional care for Javon and his siblings. They have worked with service providers and school staffs to assure that their needs are met. They will adopt the children if that is an option.

At the October 18, 2016, hearing maternal grandmother, C███D████, indicated that she was a placement option for J████ and his siblings. However, Mrs. D████ had three other grandchildren in her home and there had been issues regarding previous visits there. Services were put in place to assist C███D████ with the development of skills and a plan to have all of the children placed in her care.

At the review hearing on January 18, 2017, the court found that the children continued to do well in the L████ foster home. C███D████ was still requesting that the children be placed with her. However, additional concerns had arisen about the lack of supervision in C███D████'s home during the children's weekly visits with Mrs. D████ and their siblings. C███D████ had a hard time controlling and supervising all of the children.

At a review hearing on March 8, 2017, despite the previous emphasis and directives to C███D████ not to leave the children unattended during the sibling visits, it was discovered that she continued to do so. A plan was put in place for an additional caregiver to assist C███D████ when the children visited her, particularly when she was at work.

3

At the review hearing on September 22, 2017, the court found that there had been a significant and troubling incident during a visit with C███ D███. The children were left alone and B.W. found and took some medication that was prescribed for his grandmother. He had to receive emergency medical treatment. It became evident that, although C███ D███ deeply cares for J███ and his siblings and they enjoy their relationship with her, she would not be a future placement option for them. Since the children had been in placement for some time the permanency plan for the children was discussed, including the potential of termination and adoption by the L█████s. Father participated in the hearing via telephone. He indicated that he was in the Boot Camp Program and taking advantage of all available treatment options. He indicated he "would do whatever it takes" to have the children in his care and to be part of their lives; and, "I would go to the moon if I have too." The focus at the hearing was on Father as Mother would not be eligible for release from incarceration for several years. The court advised Father that his recent steps to complete his sentence and be in a position to provide care for the children was a positive development. However, the court also specifically advised Father that he would have to demonstrate, through his actions, that there was substance behind his commitment to provide care for J███ and his siblings. Father was ordered to follow his drug and alcohol treatment plan; to maintain contact with CYS and establish a visitation schedule with CYS once he was released from incarceration; to refrain from using controlled substances and alcohol; and, to obtain appropriate housing. If Father was following his reunification plan CYS had discretion to increase his visits and contact with J███ and his brothers.

4

Father was released from incarceration after the September 22, 2017, hearing but before the next review hearing on March 23, 2018. He made little effort to have contact with the children and form a relationship with them after he was released. He missed visits and did not attend their appointments. He would tell the children he was buying them Christmas gifts, or they would have pizza at the next visit, but then not show up. This was traumatic to the children and deeply harmed Father's relationship with them. He tested positive for cocaine use on January 7, 2018. His visits with the children were then suspended. Father had additional positive drug screens for cocaine and Suboxone. He had not obtained appropriate housing. Mother indicated that she believed she would be eligible for parole sometime in 2022.

Father's parole agent, Shawn Hartman, testified at the January 22, 2019, termination hearing. He supervised Father on two separate occasions. He initially supervised him in 2015 or 2016. Father absconded and was again incarcerated. He was then released in December of 2017. Father began utilizing controlled substances shortly after he was released from state incarceration and was, therefore, required by Agent Hartman to attend the Gateway Rehabilitation Center treatment program in Erie, Pennsylvania. He attended that program for two or three weeks and then he left Gateway and absconded. A warrant was placed for his arrest. He was apprehended in August of 2017 at his parents' (W⬛ and C⬛B⬛'s) residence in Bradford, Pa. He also committed new criminal offenses during this time period. By Order of Court dated June 20, 2019, at case numbers 462 CR 2018, 606 CR 2018 and 30 CR 2019, Father was sentenced to a period of confinement of not less than 4 years to no more than 8 years.

5

At 30 CR 2019 he pled guilty to Theft by Unlawful Taking, Criminal Trespass and Criminal Mischief. The date that these offenses occurred was June 28-29, 2018. Therefore, after Father indicated at the September 22, 2017, that he would be released from incarceration soon and would "would do whatever it takes" to have the children in his care and to be part of their lives; and, "I would go to the moon if I have too," Father: 1) had little contact with the children; 2) made promises to them that he did not follow through on and which emotionally harmed them; 3) utilized controlled substances; 4) left inpatient treatment; 5) absconded from supervision; and, 6) committed new serious criminal offenses.

J███ J.B. Jr. and B.W. have a negative relationship / bond with their Father. This conclusion is consistent with the information provided by the children's' Guardian ad litem, Mark Hollenbeck, Esquire; J███ appointed attorney, Kord Kinney, Esquire; and, Dr. Peter von Korf, an expert called by CYS.

Regarding their relationship with their Mother, former CYS caseworker Donna Trim testified that the children (J███ included) are happy to visit with and see their Mother. They would always run to her. The visits occur once a month at an SCI facility. The children's grandmother, C███ D███ often transports the children to the visits. However, as discussed below, Dr. von Korf testified that the children have an "insecure attachment" with Mother. The court accepts the opinion of Dr. von Korf regarding the classification and concerns regarding the children's relationship with Mother.

Mother testified at the May 31, 2019, termination hearing that she will be eligible for parole from state prison in 30 months. The court does not accept this

6

assertion as fact. As outlined above Mother was sentenced to several periods of consecutive confinement; and, there is nothing in the record definitively establishing the date she is eligible for parole. The court is concerned about Mother providing a clearly self-serving statement about this date and her potential to obtain parole upon her minimum without something more definitive. Mother testified that she is optimistic and, in fact, believes that she will be granted parole upon the expiration of her minimum. Mother could be required to attend a half-way house / treatment program upon her release. Further, it may take her sometime to obtain appropriate housing for the children after she is released. Therefore, at best, it will be several years before Mother is available to have the children in her care. Placing a time period on Mother's parole and availability to have the children in her care, at best, if everything goes well and Mother fully follows her parole plan, it will be in 30 to 36 months. Of course, there is the possibility that Mother will not be granted parole, or, will have set backs if she is. If this occurs it could be much longer until she is available, if at all, to care for the children. Mother testified that she has completed a Family Support Program while incarcerated; and, a domestic violence program phases I, II and II. She is taking classes to obtain her GED.

Mother testified that she has six children, 4 minor children and two adults. Two of Mother's children reside with her mother, C███D████, and, J███ and his two brothers reside in the L███████ foster home. Mother had no concerns regarding the care the L███████ are providing for the children. She thanked them in her testimony for caring for the children and being open to her having contact with them.

7.

Mother testified that she and her children would go on "outings" before she was incarcerated, like fishing, camping, swimming, the Erie Zoo. Although the court accepts this testimony as accurate, that Mother did undertake these activities with the children, the court also finds that Mother often left the children with her Mother and others before she was incarcerated. Mother struggled with addiction and would often be out of the home. There were concerns with Mother's care of the children even before she was incarcerated.

When Mother is released she will seek assistance from her Mother, C███ D███, to provide care for the children. The children do have a bond with C██D███ as they have had regular contact with her for all of their lives. Mother plans on obtaining employment when she is released. She indicated that she enjoys cleaning and would like to get a job doing that. She testified that she will follow her drug and alcohol treatment plan and goals, and, she wants to be actively involved in the children's lives.

Mother's criminal history is summarized as follows:

1) McKean County Criminal Case No. 440 CR 2002. Convicted of Criminal Attempt – Theft by Unlawful Taking (F-3), Forgery (F-3). Sentenced to one year of probation;
2) McKean County Criminal Case No. 371 CR 2004. Convicted of Simple Assault (victim Mother's sister), Reckless Endangerment, Accidents Involving Damage. Sentenced to one year probation;
3) McKean County Criminal Case No. 413 CR 2004. Convicted of Hindering Apprehension, Driving at Safe Speed and Restraint System Violation (not having child properly secured). Sentenced to one year consecutive probation;
4) McKean County Criminal Case No. 263 CR 2005. Convicted of Obstructing the Administration of Law (involving assistance to Father who she knew law enforcement was attempting to apprehend due to him fleeing a facility). Sentenced to 15 days incarceration to 6 months, no contact with Father;
5) McKean County Criminal Case No. 672 CR 2005. Convicted of Perjury, Forgery – Altered Writing, Altered and Forged Counterfeit Documents. Sentenced to 6 to 12 months of incarceration;

8

6) McKean County Criminal Case No. 73 CR 2006. Convicted of Driving Under the Influence. Sentenced to 6 months of consecutive probation;

7) McKean County Criminal Case No. 635 CR 2009. Convicted of Simple Assault. Sentenced to 115 days to 12 months. Parole later revoked at this number for new violations (new DUI and consuming alcohol). Her sentence for the revocation was remanded for the balance of her sentence and eligible for re-parole after serving 45 days;

8) McKean County Criminal Case No. 463 CR 2010. Convicted of Driving Under the Influence – 2nd Offense. Sentenced to 6 months to 3 years in a State Correctional Facility;

9) McKean County Criminal Case No. 126 CR 2015. Convicted of Delivery of Suboxone. Sentenced to 1 to 3 years in a State Correctional Facility;

10) McKean County Criminal Case No. 157 CR 2015. Convicted of Delivery of Amphetamines. Sentenced to 18 months to 36 months consecutive to the sentence at 126 CR of 2015;

11) McKean County Criminal Case No. 158 CR 2015. Convicted of Delivery of Vicodin. Sentence of not less than 18 months to no more than 3 years consecutive to the sentence at 157 CR 2015;

12) McKean County Criminal Case No. 41 CR 2016. Convicted of Criminal Mischief/ Damaging Property and Criminal Trespass / Entering a Structure. Sentenced to 2 years of concurrent probation;

13) McKean County Criminal Case No. 62 CR 2016. Convicted of Simple Assault and Fleeing and Eluding. Sentenced to 2 to 4 years consecutive to the sentence at 158 CR 2015. The victim of the assault was Father.

1-22-19 Hearing Tr. Pages 42 -52. Father's criminal history is even more extensive than Mother's and is outlined in the January Hearing Transcript pages 34 to 43.

J████ and his brother J.B. Jr. remember residing with their Mother. They have a bond with her. This bond is affected by their relationship with and frequent contact with their maternal grandmother, C███D███, and their siblings. There is encouragement from the family and extended family to support the hope and goal of the children being back with Mother and into the family unit. This is certainly understandable but it does put J████ and his siblings in a very difficult position. They care for their Mother and have connection to her and their maternal family, but, they have been residing with the L██████s for several years and recognize that they have

9

been caring for them and assuring that their needs are met. B.W., due to his age, is in a different position than J⬛ and J.B. Jr. He has limited recollection of being in his Mother's care before she was incarcerated. He is much more bonded to the Lancasters than his siblings. J⬛ and J.B. Jr. have behavioral and emotional issues which were likely caused by or enhanced by the lack of stability in their lives. B.W. is not facing these behavioral issues. J⬛ and J.B. Jr. have fully accepted Mother and their maternal grandmother's assertion that Mother will be released from prison and they will be back in her care. The have expressed this belief to their caseworker, to their Guardian ad litem Mark Hollenbeck, Esquire, to their counsel, Kord Kinney, Esquire, and to Dr. von Korf. As discussed elsewhere in this Memorandum, that conclusion may turn out to be unrealistic, but the fact that it is J⬛ and J.B.'s Jr.'s adamant conclusion / desire has to be recognized and given consideration.

Dr. Peter von Korf's involvement in this case occurred when counsel for J⬛ and J.B. Jr., Kord Kinney, Esquire, made an oral motion to obtain an expert opinion regarding the relationship / bond between Mother and J⬛ and J.B. Jr. and the potential negative affect of severing that bond. In an Opinion and Order dated January 22, 2019, the court granted the Motion. Attorney Kord Kinney indicated at the May 31, 2019, hearing that he did not intend on calling Dr. von Korf. CYS Solicitor Michele Alfieri-Causer indicated that CYS did intend on calling Dr. von Korf. Therefore, further hearing was held on October 4, 2019.

Regarding Father Dr. von Korf had no difficulty concluding that termination of his parental rights was in the best interests of all 3 children. He indicated that "none of the

10

children expressed any attachment to Father." Any memory they had of him was negative. Therefore, it was his opinion that termination of Father's parental rights was appropriate because it would eliminate concerns / fears that the children have regarding their Father and his potential future contact with them.

Regarding Mother Dr. von Korf's testimony and opinion was different regarding J▅▅▅ and J.B Jr. – and – B.W. It was his opinion that B.W., due to his age, has very limited memory of residing with Mother, has not established a strong attachment to her, and, he has developed a bond with the Lancasters because he has been in their care for the last several years. Therefore, he was not concerned about potential negative effects of termination of parental rights for B.W. He recognized that J▅▅▅ and J.B. Jr. have expressed a desire to not have their Mother's parental rights terminated and to work towards returning to her care. J▅▅▅ and J.B. Jr. stated to him, as they have to others: "when my mom gets out of jail we are going to live with her." He found that J▅▅▅ and J.B. Jr. have "affection and fondness" for their Mother, but, their bond with her "is not secure." He testified: "these children had very low scores in terms of parental attachment." He found that J▅▅▅ and J.B. Jr. "have no attachment to an adult;" and, "this is very unusual." Dr. von Korf's "central opinion" was that "these children are insecurely attached to all caregivers in their life;" and, "that circumstance had to have some root in their life." He found the children to be "avoidant children" who "rely heavily on self." He found J▅▅▅ to be "depressed, angry – emotional troubled." He found B.W., who again has spent more of his young life with the L▅▅▅▅s, "in the best circumstance. He is doing the best, best of all 3 to make gains."

11

He went on to explain that "attachments can evolve over time. It can be repaired. They can become familiar with secure attachments." He initially rendered a clear opinion that termination and adoption would give all 3 children the best option to form secure attachments. However, when pressed regarding J███ and J.B. Jr.'s preference to return to their Mother's care his opinion became less confident regarding potential outcomes. He testified that he "hoped" that once parental rights were terminated J███ and J.B. Jr. would be open to adoption by the L██████ and change their positions and agree to it. However, he also admitted that there was no certainty that would occur. Regarding J.B. Jr. he recognized that he has "unrealistic 12 year old conclusions" regarding reunification with Mother. He agreed that it would be a horrible outcome if J███ and J.B. Jr. did not agree to adoption, they later had resentment regarding the removal of the option of returning to their Mothers care, the L██████s were no longer willing to provide care / a home for them and Mother was not an option because her rights would have been terminated. However, it was also his professional opinion that "the status quo has to change. SPLC (subsidized permanent legal custodianship) would just maintain the status quo."

During cross examination by Parent's Counsel, Dr. von Korf agreed that his evaluation was not as thorough as he would have preferred. He agreed that he had not met with the Parents, which is something he would normally do. He indicated that "we ran out of time," referring to the fact that the time between when he was initial contacted and when the first hearing was held on May 31, 2019, was limited. However, the court found this explanation somewhat questionable because, had he needed more

12

time to complete a more thorough evaluation, the court would have granted it; and, the

next hearing after the May 19, 2019, hearing did not commence until October 4, 2019.

Nevertheless, the court found Dr. von Korf's analysis to be accurate and of assistance.


**AUTHORITY:**

The statutory requirements for termination in this case are as follows:

**(a) General rule.** -- The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed

13

from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. §2511(a)(1),(2), (5) and (8).


The grounds for terminating parental rights under Section 2511(a)(2) are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. In re A.L.D., 797 A.2d 326, 337 (Pa.Super. 2002). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. Id. at 340.

In In re Geiger, 459 Pa. 636, 331 A.2d 172 (1975), our Supreme Court first announced the fundamental test in terminating parental rights pursuant to section 2511(a)(2). According to Geiger,


> three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. Id. at 173-174.

In Re R.H., 33 A.2d 95, 100 (Pa.Super. 2011).


When addressing a request to terminate parental rights the Court is required to "[g]ive primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.C. §2511(b). Further, "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. Id.

14

An inquiry into whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child is a distinct aspect of a termination hearing, to be undertaken only after the statutory requirements of section 2511(a) have been met. Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of a child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The burden of proof upon a petitioner in a termination proceeding is by clear and convincing evidence:

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking termination of parental rights are valid. . . . The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

in the Interest of A.S., 11 A.3d 473, 477 (2010)(citations omitted).

When reviewing the evidence the Court, as the trier of fact, "is likewise free to make all credibility determinations and resolve conflicts in the evidence." Id.

A parent's right to the custody of his or her children is not absolute and has to be balanced against a child's right to have proper parenting:

A parent's basic constitutional right to the custody and rearing of . . . [his] children is converted, upon the failure to fulfill . . . parental duties, to the children's right to have proper parenting and fulfillment of [the child's] potential in a permanent and healthy, safe environment. There is a recognized connection between Pennsylvania law on termination of parental rights and the Adoption and Safe Families Act . . . This act was designed to curb an inappropriate focus on

15

protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families.

Id. at 478 (citations omitted).

In In re Adoption of S.P., 47 A.3d 817 (Pa. 2012) the Pennsylvania Supreme Court set forth the standard to utilize when addressing parent's future period of incarceration:

> In line with the expressed opinion of a majority of justices in R.I.S., our prior holdings regarding incapacity, and numerous Superior Court decisions, we now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). See e.g. Adoption of J.J., 515 A.2d at 891 ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); E.A.P., 944 A.2d at 85 (holding termination under § 2511(a)(2) supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).' If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, inter alia, how a parent's incarceration will factor into an assessment of the child's best interest.

In re Adoption of S.P., 47 A.3d 817, 830-831 (Pa. 2012). In that case the Superior Court had reversed the trial court, finding that the trial court had given too much weight to the fact that a parent was incarcerated. The Supreme Court reversed the Superior Court holding:

> As applied to this case, we conclude the Superior Court erred in reversing the trial court's decision to terminate Father's parental rights where that decision was supported by the record and did not constitute an abuse of discretion or an error of law. The trial court properly found that Father has been incarcerated since prior to Child's birth and never provided Child with essential parental care. Accordingly, the court did not abuse its discretion in concluding that Father's "repeated and continued incapacity ... caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being." 23 Pa.C.S. § 2511(a)(2). Moreover, the record supports the trial court's findings regarding the uncertainty of Father's parole date and that, even upon parole, Father would reside in a half-way house and would need to obtain housing, employment and transportation in addition to parenting skills. Accordingly, the trial court did not abuse

16

its discretion when it concluded that "the conditions and causes of the incapacity ... cannot or will not be remedied" by Father. 23 Pa.C.S. § 2511(a)(2). Finally, given that Child did not have a relationship with Father, that Father would not be able to provide for her, especially considering her special needs, and that Child had a strong bond with her maternal half-sister, the trial court did not abuse its discretion in concluding that terminating Father's rights would best serve the "developmental, physical and emotional needs and welfare" of Child. 23 Pa.C.S. § 2511(b).

In re Adoption of S.P., 47 A.3d 817, 831 (Pa. 2012). It is important to note that, when conducting their analysis regarding the effect of incarceration, the Supreme Court in In re Adoption of S.P gave consideration to the length of future incarceration and to the quality of the existing relationship between the parent and the trial (finding the relationship was poor thus supporting termination).

In In the Matter of T.D., 949 A.2d 910 (Pa.Super. 2008), the Superior Court addressed the standard to apply when a parent is unavailable, the children have a bond and connection with the parent, and, the children express reluctance to consent to an adoption.

This Court confronted a similar issue in In re E.M., 908 A.2d 297 (Pa.Super.2006), and reversed the trial court's order terminating a mother's parental rights to her two children. In that case, the trial court determined that the appellant maintained sporadic contact with her two teenage children during placement and she failed to perform her parental duties. Id. at 301–302. Nevertheless, the children, who had maintained emotional bonds with their mother, desired to reunify and only would consent to adoption if it were a last resort. Id. at 307. Despite the apparent bond, the trial court found that the agency had satisfied the statutory requirements of section 2511(a) and section 2511(b). On appeal, this Court reversed, finding that, under the unique circumstances of that case, the trial court had abused its discretion in concluding that termination served the needs and welfare of the children.

In reaching its conclusion, this Court reasoned that, given the children's ages, fourteen and fifteen, and the requirement of their consent to adoption, the lack of an identifiable pre-adoptive home, a stable foster home willing to care for them until they reach majority, and the children's commitment to maintaining contact with their mother, even in the face of termination, "the reality is these children most likely will remain in foster care until they reach majority regardless of the outcome of this case." Id. at 306–07. Specifically, the court found, "nothing will change whether mother's rights are terminated or not, and the only thing that will be accomplished by termination is that the children will be

17

true orphans.... [T]he children currently have permanency to the fullest extent possible under the circumstances." *Id.* at 309.

Later, in *In re K.C.F.*, 928 A.2d 1046 (Pa.Super.2007), this Court distinguished the facts of *In re E.M.* from the facts underlying that case, wherein the appellant argued that her children's ages, eleven, nine, and eight, and the lack of a pre-adoptive home would prevent them from being adopted. As the *In re K.C.F.* Court observed, unlike the children in *In re E.M.*, the three children at issue in *In re K.C.F.*, had not yet reached the age where consent was required for adoption, and two of the children acknowledged that the Mother could not consistently meet their needs. *Id.* at 1053. Similarly, while the remaining child preferred to reunite with his mother, he was not secure in her presence. *Id.* Accordingly, noting that the Juvenile Act does not require pre-adoptive placement as a precondition to termination of parental rights, we found that the mother did not establish that her children's ages would prevent them from being adopted.

The case at bar aligns with *In re K.C.F.* rather than *In re E.M.* Herein, T.D. is only twelve, and although he must consent to adoption, he still is several years from reaching the age of majority. Moreover, his foster placement is uncertain. T.D. has been removed from the pre-adoptive foster home in which he resided since August 2006, and in stark contrast to the children in *In re E.M.*, the record does not indicate that his present foster home, the second since being removed from pre-adoptive care, is committed to caring for him for six years until he is eighteen. Hence, the unique circumstances *923 that compelled our conclusion in *In re E.M.* are absent from this case. As in *In re K.C.F.*, T.D.'s age, loyalty to his natural parents, and apparent lack of an identifiable pre-adoptive placement will not automatically preclude him from attaining permanency after parental rights have been terminated. *See In re K.C.F.*, 928 A.2d 1046. In contrast, however, in light of Parents' demonstrated inability to provide the minimum level of parental care, preserving Mother's and Father's parental right, would foreclose any hope for adoption and condemn T.D. to foster care until he reaches majority. Accordingly, the court did not abuse its discretion in concluding that termination best serves T.D.'s needs and welfare.

In the Matter of T.D., 949 A.2d 910, 922-923 (Pa.Super. 2008).

In In re T.S.M., 71 A.3d 251 (Pa. 2013), the Pennsylvania Supreme Court discussed at length the weight to be given to the potential of a child's future adoption if parental rights are terminated:

Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond

18

with their foster parents. *See In re K.M.*, 53 A.3d at 791. Indeed in cases where the petitioner is a party standing *in loco parentis*, the statute requires the party to file a report of intention to adopt. 23 Pa.C.S. § 2512(a)(3). Likewise, this Court has noted that a petition to terminate parental rights filed by a biological parent "is only cognizable when it is accompanied by a prospective stepparent's intention to adopt the child," noting that *630 the public policy behind this provision is to prevent " state-created orphans." *In re Adoption of L.J.B.*, 610 Pa. 213, 18 A.3d 1098, 1107–08 n. 11 (2011) (plurality). Notably, however, the Adoption Act specifically provides that a pending adoption is not a prerequisite to termination of parental rights involving agencies such as CYF: "If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists." 23 Pa.C.S. § 2512(b).

The Superior Court has rejected the suggestion that termination of parental rights is inappropriate when adoption is not imminent and has allowed termination even if it results in the child temporarily being without one or both parents. *See In re C.W.U., Jr.*, 33 A.3d 1, 9 (Pa.Super.2011). Additionally, the Superior Court has observed that termination may improve the likelihood of finding an adoptive home. *See In the Matter of T.D.*, 949 A.2d at 922–23. Indeed, in some cases, a child's bond with a parent, who has proven incapable of caring for the child, may impede the child's ability to attach to a pre-adoptive family who can provide the needed care and stability. *See Id.* at 921; *In re J.F.*, 904 A.2d at 1216. Nonetheless, the Superior Court has expressed concern for terminating parental rights absent a pre-adoptive home especially in the case of an older child, whose consent is needed for adoption, lest the child age out of foster care without any permanent family. *See In the Matter of T.D.*, 949 A.2d at 922. Moreover, members of this Court have opined that the existence of a pre-adoptive home is "an important factor" in termination cases. *In re R.I.S.*, 614 Pa. 275, 36 A.3d 567, 575 (2011) (Saylor, J., concurring). We have questioned whether a grant of termination would require that an "agency must intend subsequent to termination to seek out an adoptive parent." *In re Adoption of L.J.B.*, 18 A.3d at 1107 n. 8. Indeed, decades ago, we opined in *obiter dictum* that an agency may not terminate parental rights absent a contemplated adoption. *In re B.E.*, 474 Pa. 139, 377 A.2d 153, 155 n. 5 (1977). The Office of Children and Family in the Courts, however, recently provided direction in the Dependency *631 Benchbook, "While having an identified adoptive resource is not a prerequisite for [termination of parental rights], ideally there should be a strong likelihood of an eventual adoption." Administrative Office of Pennsylvania Court's Office of Children and Families in the Courts, *Pennsylvania Dependency Benchbook* § 12.1 at 126 (2010).

678 As the prior paragraphs reveal, contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a

19

strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination **269 of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g., R.J.T.,* 9 A.3d at 1190 (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

9 In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, *632 requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. ASFA was enacted to combat the problem of foster care drift, where children, like the children in this case, are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. *See In re R.J.T.,* 9 A.3d at 1186; *In re Adoption of S.E.G.,* 901 A.2d at 1019. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. *See,* 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months). Considering these statutory purposes, we reject the trial court's suggestion that "the ultimate exception to ASFA time frames should be until a child finds meaningful, loving relationships with a family and committed homes are established." Tr. Ct. Op. at 19. The trial court's suggested exception could swallow the rule, and permanency could be obstructed in cases where children have been unable to form healthy bonds with foster families, potentially as a result of their unhealthy bonds with biological parents who may be undermining

20

their relationship with their foster family. *See, e.g. In the Matter of T.D.*, 949 A.2d at 921; *In re J.F.*, 904 A.2d at 1215–16 (terminating parental rights where biological parents could not parent child and instead hampered child's ability to bond with foster family and attain stability).

10 Similarly, we question the trial court's use of concurrent planning in this case. We commend the trial court for recognizing that concurrent planning is a best practice, as it allows agencies to provide families with services in hopes of reunification while also preparing for the child's potential adoption. Concurrent **270 planning is especially useful early in *633 the proceedings when it is unclear whether the parents will be able to learn to parent their children. Conversely, we caution that concurrent planning should not be used to prolong instability for children when it becomes clear that parents will be unable to provide their children's basic needs in the near future. Trial courts' use of concurrent planning beyond its useful life can create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents, thus perpetuating the problem of foster care drift. As Dr. Pepe observed in her testimony, the child is conflicted "between loyalty to a biological parent and loyalty to a foster parent, pre-adoptive parent, adoptive parent. When it is clear to the child that they are in their permanent home, then the conflict can diminish, which can result in less disruptive behaviors and a greater sense of security." N.T., 8/31/11, at 107.

While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children. The trial court made valiant efforts to utilize concurrent planning and family group decision making; however, these efforts were inappropriate in a case such as this, where, at the time of the termination hearing, Mother had the benefit of services for over five years without showing the potential of being able to parent the children in any reasonable period of time.

11 In this case, the children have unhealthy bonds to Mother, who is seemingly the root of their manifold psychological and behavioral conditions. Moreover, Mother appears to be interfering with the children's bonding to their foster families, resulting in confusion for the children and further delay in permanency for the children. For example, Ty. M. reported that Mother told him that he would not be adopted and that his foster brothers "were not his brothers." *See* Report of Dr. Pepe, 6/23–30/11, at 5. Dr. Pepe opined that Ty. M. "would naturally have ambivalence regarding adoption given his age [eight] and level of attachment to his biological *634 mother but that her comments could serve to cause increased confusion with the child." *Id.*

Whether or not the children have current bonds to their foster families, there appears to be a "strong likelihood of an eventual adoption." *Pennsylvania*

21

*Dependency Benchbook* § 12.1 at 126. Indeed, Dr. Pepe specifically recommended adoption for Ty. M., Tai. M., and N. M., N.T., 8/31/11, at 102; Report of Dr. Pepe, 6/23–30/11, at 5; Report of Dr. Pepe, 12/10–2/11, at 31. In regard to Ti. M., Dr. Pepe did not recommend adoption at the time of the evaluation, but nonetheless did not recommend reunification and suggested reduced visitation with Mother. Report of Dr. Pepe, 12/10–2/11, at 28. The youngest child, Tae. M., previously had a very strong and positive bond with his pre-adoptive foster mother who, unfortunately, became ill and unable to care for Tae. M. Report of Dr. Pepe, 12/10–2/11, at 23. While no adoptive home was present at the time of the hearings, one can presume that a permanent home will be found for Tae. M, when he is freed for adoption.

Although we defer to a trial court's determination regarding termination when it is supported by the record, we must reverse the trial court's determination in this case because we find the court's conclusion to be manifestly unreasonable, and thus an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d at 826. In relying upon the **271 mere existence of the bond between Mother and the children, the trial court failed to recognize the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond with Mother, especially as it affected the children's ability to form attachments to foster families who could have provided the necessary love, care and stability that these children have so needed for the past decade. We conclude without hesitation that it best serves their needs and welfare to sever their bond with Mother permanently, in order to permit them to be placed forthwith into healthy, permanent homes. Accordingly, we reverse the Superior Court decision affirming the trial court's denial of termination of parental rights and order the trial court to enter orders terminating Mother's parental *635 rights as to the five children before this Court. We expect this to be done promptly, and we further expect the child welfare agency and court to give this case their utmost attention so that these children have a chance for normal lives. Jurisdiction relinquished.

In re T.S.M., 71 A.3d 251, 268-271 (Pa. 2013).


## DISCUSSION:

At the conclusion of the termination hearing all of the attorneys indicated that this is a "difficult decision." However, when applicable and controlling authority is applied to the specific proven facts, it is not. It is an emotionally difficult and charged situation / case, but

logically applying the appropriate legal standard to the facts clearly and definitively leads to termination of both Parents' parental rights.

First, the required statutory factors set forth in 23 Pa.C.S. §2511(a)(1),(2), (5) and (8) have been demonstrated. Parents, due to criminal convictions, substance use / abuse and failure to perform parental duties, have been unavailable for several years. Both are now incarcerated and will be for at least several more years. Therefore, the only potential issue requiring further legal analysis is: Will termination of parental rights best serve the developmental, physical and emotional needs and welfare of the child (addressing each child's situation separately)? When answering this question we are required to: "discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." In re C.P., 901 A.2d 516, 520 (Pa.Super. 2006), as cited by, In re K.C.F., 928 A.2d 1046, 1049 (Pa.Super. 2007).

The holding of our Supreme Court in In re T.S.M. compels termination of parental rights in this case, including the following:

> In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes.

In re T.S.M., 71 A.3d 251, 269 (Pa. 2013). After the Supreme Court in In re T.S.M. mandated "courts" to consider "the ticking clock of childhood," they chastised the lower court for not doing so:

23

While we have no doubt that the trial court in the case at bar acted with full intention of protecting the needs and welfare of these children in sustaining their bonds with Mother, we conclude that the denial of termination merely prolonged and, indeed, exacerbated the harm suffered by the children.

In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

Regarding Father the children have a negative bond and negative memories of him. He has very little contact with the children. He made promises to the court regarding the efforts that he was going to make upon his release from incarceration. He didn't follow through with any of them. He immediately began utilizing controlled substances when he was released and is now serving a lengthy criminal sentence. Therefore, it is definitely fulfills the needs and welfare of J⬛ and his siblings for Father's parental rights to be terminated.

Mother has been involved in the criminal justice system, consistently and regularly, since 2002. She had numerous periods of local supervision and attempted rehabilitation that resulted in revocations and new convictions / sentences. Her criminal activity only ended when she was incarcerated following the filing of charges in 2016. She has a history of alcohol and drug use / abuse and mental health concerns (mental health evaluations required as part of criminal sentences). There is nothing in the record indicating that Mother has addressed the drug and alcohol and mental health concerns that initially led to her previous criminal convictions and difficulties. Mother did testify that she plans on not falling back into the destructive patterns she had been involved in for at least 14 years prior to 2016. However, there is no evidence that she has completed any drug treatment or mental health programs that would support her assertions.

Mother testified that she and her children would go on "outings" before she was incarcerated, like fishing, camping, swimming, the Erie Zoo. However, this self-serving and rosy analysis of Mother's care and contact with the children prior to her recent period of incarceration does not line up with reality. She was frequently out of the home and involved in

24

activities that were destructive and, at times, resulted in criminal charges. She frequently relied on her mother and others to care for the children. As Dr. von Korf found, J█████ and J.B. Jr. "have no attachment to an adult;" and, "this is very unusual." Dr. von Korf's "central opinion" was that "these children are insecurely attached to all caregivers in their life;" and, "that circumstance had to have some root in their life." He found the children to be "avoidant children" who "rely heavily on self."

The court is in agreement with Dr. von Korf's opinion that "the status quo has to change. SPLC (subsidized permanent legal custodianship) would just maintain the status quo." The court accepts this opinion because: it is supported by the facts in this case, the years of instability the children have already gone through and are potentially facing if a major change is not made soon; and, it is supported by applicable legal authority and guidance including the holding in In re T.S.M., 71 A.3d 251, 269 (Pa. 2013).

The court recognizes that Parents, and in particular Mother, have and will focus on the preference of J██████and J.B. Jr. to reunify with her when she is released from incarceration; and, the affection they have for her. This assertion is emotional, that two boys want to be with their mother, of course, pulls on the heart strings. However, this is a decision that can't be made by emotion and heart strings. It has to be made based on logic and legal analysis. The fact that these young children want to be reunified with their Mother was given weight and consideration, but is outweighed by the reality of the situation. *See,* In the Matter of T.D., 949 A.2d 910 (Pa.Super. 2008). Mother has had difficulty for years and it is unlikely anything will change even if we wait for several more

years for her to be released from incarceration.[1] The clock here has ticked long enough, longer than it should have.  No outcome is guaranteed, but, at this point, based on the prior history and the facts and circumstances in this record, by far the best potential for J████and his siblings to obtain permanency and stability is to terminate parental rights and create  the possibility of their adoption by the L██████s. There is a short window for taking meaningful action here – and that window is closing rapidly.

WHEREFORE, WE ENTER THE FOLLOWING:

---

[1] The court also finds that the children are motivated and encouraged by Mother, their maternal grandmother, ████████who they have frequent contact with, and other family members, to support and accept the goal and dream of returning to Mother's care.  This is further evidence that the status quo is emotionally pulling them in different directions.